## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01241-SBP

WYOMA MARTINEZ,

      Plaintiff,

v.

DOUGLAS HARROUN, individually; and
CITY OF AURORA, COLORADO, a municipality;

      Defendants.

---

## AMENDED CIVIL RIGHTS COMPLAINT AND JURY DEMAND

---

Plaintiff, Wyoma Martinez, by and through her attorneys, Zachary Warren and Annika Adams of HIGHLANDS LAW FIRM, hereby brings this Amended Complaint and Jury Demand against Douglas Harroun and the City of Aurora, Colorado ("Aurora") (each a "Defendant" and, together, the "Defendants"), and alleges the following:

## I. INTRODUCTION

On the evening of January 11, 2023, Wyoma Martinez, a then-49-year-old Hispanic woman who is disabled and suffers from Complex Regional Pain Syndrome ("CRPS"), was attacked by then-Aurora Police Department ("APD") officer Douglas Harroun. Ms. Martinez was walking her small and well-behaved dog, Argyle, at her apartment complex, when Mr. Harroun pulled into the parking lot. Apparently frustrated that Ms. Martinez was not moving quickly enough—owing to her CRPS and impaired gait—the Defendant began revving his engine and came dangerously close to hitting Ms. Martinez and her dog. After Ms. Martinez

motioned toward the icy and snow-covered pavement and indicated that she was trying her best to remove herself from the situation, Mr. Harroun pulled over, exited his vehicle, and began to aggressively berate Ms. Martinez. He came so close to her that she felt particles of spit on her face as he yelled at her from mere inches away. Ms. Martinez, in an attempt to keep herself safe, told Mr. Harroun that she was disabled, had mace on her person, and that he needed to back up.

Mr. Harroun then punched Ms. Martinez on the left side of her face with his right hand, grabbed her arm, slammed her to the ground, and continued to punch her in the face and neck multiple times while she cried out in pain and lay helpless on the ground. Importantly, Mr. Harroun held himself out as an APD officer during this incident, pursuant to APD Directive 14.4, which states "[S]worn members confronted with an off-duty situation must use discretion and good judgment in deciding if direct participation is necessary as opposed to summoning an on-duty police officer."

Thankfully, some courageous bystanders took notice of this violent attack, and intervened on behalf of Ms. Martinez—yelling at Mr. Harroun and immediately calling 9-1-1. In between strangling Ms. Martinez and responding to the onlookers who were attempting to intervene, Mr. Harroun pulled out his APD police badge, identified himself as a police officer, and told Ms. Martinez that she was under arrest. He also provided his badge numbers to the good Samaritans who intervened and assured them that he was a cop—and that he was doing his job. Even after releasing Ms. Martinez, Mr. Harroun made clear—pursuant to his authority as a police officer with APD—that she was not free to leave, that she was "going to jail," and that she was being detained until other officers arrived.

When other officers arrived on the scene and conducted an initial investigation, it became clear that Mr. Harroun was the aggressor, that he had violently attacked Ms. Martinez, and that his unlawful arrest and seizure of Ms. Martinez was entirely unfounded. In relatively short order, Mr. Harroun was arrested and charged with multiple felonies and a misdemeanor for his violent and wrongful arrest of Ms. Martinez.

## II.  <u>JURISDICTION AND VENUE</u>

1.      This action arises under the Constitution and laws of the United States, including, 42 U.S.C. § 1983, 1988, and the laws of the State of Colorado, including Colo. Const. art. VI, § 9(1), and Colo. Rev. Stat. § 13-1-124.

2.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343 relative to the federal claims. Jurisdiction for the supplemental state law claims is conferred upon this Court by 27 U.S.C. § 1367.

3.      Venue is proper within the District of Colorado pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to the claims in this matter occurred within the District of Colorado.

4.      Plaintiff timely and properly submitted a Notice of Claims in connection with the state law claims stated in this matter and has properly exhausted all administrative remedies.

## III.  <u>PARTIES</u>

5.      At all times relevant to this action, Wyoma Martinez was an adult resident of the State of Colorado and citizen of the United States. At all times relevant to this action, Ms. Martinez was a person with disabilities as that term is defined in both Section 504 and the ADA.

6.      At all times relevant to this action, Defendant Douglas Harroun was a citizen of the United States and a resident of the State of Colorado and was acting under color of state law in his capacity as a law enforcement officer with Aurora Police Department.

7.      Aurora is a municipality in the State of Colorado, which operates under Article XX, Sections 10-13 of the Constitution of the State of Colorado. Aurora is a "person" subject to suit under 42 U.S.C. § 1983.

8.      The Aurora Police Department is a department of Aurora. At all times relevant to this matter, officers and personnel of the Aurora Police Department ("APD") were acting as agents of Aurora under color of state law.

9.      The Civil Service Commission is a department of Aurora. At all times relevant to this matter, personnel of the Civil Service Commission were acting as agents of Aurora under color of state law.

10.     At all relevant times, Defendant Aurora was responsible for the oversight, supervision, discipline, and training of APD personnel, including Defendant Harroun.

## IV.  FACTUAL ALLEGATIONS

11.     The Plaintiff is a fitness enthusiast, loving dog mom, and disabled woman who suffers from Complex Regional Pain Syndrome ("CRPS").

12.     CRPS is a medical condition with primary symptoms of chronic and distressing pain, which may be localized to an extremity (the arm, hand, leg, or foot) or may affect multiple parts of the body.

13.     Although there is some debate within the scientific literature regarding the root cause (or causes) of CRPS, it is clear that nerve damage owing to physical trauma is one of the

more common causes.[1] Consistent with this understanding, the Plaintiff developed CRPS following an automobile accident in 2018.

14.     CRPS is viewed as among the most painful of all known diseases, with patients' scores on the McGill Pain Questionnaire being among the highest of any diagnostic group, surpassing even the scores of patients who have experienced amputation of a limb or childbirth.[2]

15.     While the symptoms that the Plaintiff experiences as a result of her CRPS are dynamic and varied, at all times relevant to this matter, the entire left side of her body— including her left arm, left leg, left foot, and the left side of her abdomen—were extremely sensitive. This means that even seemingly benign impact or pressure to the left side of her body, which would ordinarily not affect a normal person, can be excruciating for the Plaintiff.

16.     As noted by the Mayo Clinic, oftentimes "[t]he pain is out of proportion to the severity of the injury."

17.     According to the Mayo Clinic, other signs and symptoms of CRPS include the following:

- Continuous burning or throbbing pain, usually in the arm, leg, hand or foot
- Sensitivity to touch or cold
- Swelling of the painful area
- Changes in skin temperature — alternating between sweaty and cold
- Changes in skin color, ranging from white and blotchy to red or blue
- Changes in skin texture, which may become tender, thin or shiny in the affected area
- Joint stiffness, swelling and damage

---

[1] Complex Regional Pain Syndrom (https://www.mayoclinic.org/diseases-conditions/crps-complex-regional-pain-syndrome/symptoms-causes/syc-20371151).
[2] Lee, Do-Hyueong, *Risk Factors for Suicidal Ideation among Patients with Complex Regional Pain Syndrome* (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3942549/).

- Muscle spasms, tremors and weakness (atrophy)
- Decreased ability to move the affected body part

18.    Sadly, the Plaintiff has experienced each of these symptoms.

19.    However, prior to this incident, the Plaintiff used holistic remedies like diet and exercise to control the symptoms of her CRPS, and by summer 2022 was not experiencing the aforementioned symptoms as frequently as she did initially following her diagnosis.

20.    In other words, the Plaintiff had gotten her CRPS into remission, and was working to rebuild her life by being a healthy and active individual.

21.    Unfortunately, months of hard work and progress were undone when the Plaintiff was violently attacked by Defendant Harroun and sustained significant and lasting physical and emotional injuries.

**Defendant Harroun Aggressively Contacted the Plaintiff for Walking Her Dog Off-Leash in the Parking Lot of Her Own Apartment Complex**

22.    On the evening of January 11, 2023, the Plaintiff took her dog, Argyle, for a walk around her apartment complex. Per the rules of her apartment complex, he was leashed throughout the course of her walk.

23.    However, as she approached the side entrance of her apartment, she encountered an extremely icy and snow-covered patch of pavement, which apparently had not been cleared by maintenance or contractors, and decided to let her small dog, who was under voice control, off-leash to ensure that he did not accidentally pull her down, causing potentially dangerous injuries.

24.    Notably, at the time, due to the effects of freezing temperatures on her CRPS, the Plaintiff was experiencing significant swelling and stiffness on her left side, which caused her to

walk more slowly and with a noticeably impaired gait. As a result, she feared that even a slight tug on the leash by her small dog might pull her off balance—and that keeping him under voice command while approaching the apartment entrance was the safest option.

25.     At the same time, Defendant Harroun, also a resident of the same apartment complex, was pulling into the parking lot.

26.     As the Plaintiff was attempting to safely navigate the icy patch by moving toward a row of parking garages, Defendant Harroun aggressively approached her with his vehicle, coming within just a few feet and revving his engine at her.

27.     Once reaching a relatively stable position on the slick pavement, the Plaintiff turned towards Defendant Harroun's vehicle and threw up her hands and said aloud: "What are you doing?"

### Defendant Harroun Immediately Escalated the Situation by Verbally Threatening and Physically Assaulting the Plaintiff

28.     At this point, Defendant Harroun quickly accelerated towards the Plaintiff as if he were going to hit her, slamming on his brakes right next to her, leaving very little space and effectively trapping her between his vehicle and the row of parking garages which the Plaintiff was walking alongside.

29.     Defendant Harroun quickly exited the vehicle, rushed to confront Mr. Martinez face-to-face, and began screaming at her mere inches from her face. He was so belligerent and confrontational towards Ms. Martinez that she could feel spit hitting her face while he screamed at her.

30.     The Defendant was adamant that she should get out of the way and move more quickly while walking on the icy pavement.

31.     The Plaintiff told him: "You need to get away from me." At no point did she approach Defendant Harroun, gesticulate in his direction, or otherwise exhibit any behavior that could be reasonably perceived as escalating the situation or being aggressive.

32.     To the contrary, the Plaintiff explicitly told Defendant Harroun that she had a disability and that she was not capable of moving any faster.

33.     In fear for her safety in the midst of being intimidated and harassed by Defendant Harroun, and knowing that she was alone and in the dark, the Plaintiff reached into her pocket to retrieve her cell phone to summon law enforcement or other assistance.

34.     Only at this point did the Plaintiff realize that she did not have her cell phone on her person, but that she did have a small unopened can of pepper spray which she lawfully carried when taking her dog out at night for her safety.

35.     As Defendant Harroun continued to escalate the situation, further approaching her and shouting at her, the Plaintiff, in fear for her safety, warned him that she had pepper spray on her person in an attempt to get him to back off and allow her to safely exit. At no point in time did the Plaintiff unwrap the protective packaging on the can of pepper spray or otherwise attempt to use it.

36.     Instead of allowing the Plaintiff to safely leave, Defendant Harroun, without warning, grabbed her wrist, punched her in the face with a closed fist, slammed her to the ground, and then continued punching her approximately four or five times in the face and throat while pinning her to the ground.

37.     Defendant Harroun then identified himself as a police officer, produced his badge, and told the Plaintiff numerous times that she was under arrest and going to jail, all while

physically pinning her to the ground with one hand around her neck while she lay helpless and crying out in pain.

38.     Only after several witnesses, each of whom were residents of the apartment, intervened did Defendant Harroun remove his hands from the Plaintiff's neck and stand back from her body, which was lying on the ground in a pool of blood, mud, and snow.

39.     As he lifted himself off of the Plaintiff, Defendant Harroun kept his hands around her neck to push his body weight up, effectively continuing to strangle her and causing further injury.

40.     Notably, Defendant Harroun had pinned the Plaintiff to the ground on her left side—the side most effected by her CRPS—causing her extreme and lasting pain due to her increased sensitivity.

41.     At this point, Defendant Harroun instructed the Plaintiff to stand near one of the yellow parking pillars in the apartment parking lot, and told her explicitly that she was under arrest, not free to leave, and that he would physically subdue her again unless she stood in that specific spot until other officers arrived.

42.     When officers arrived on scene, they interviewed witnesses and quickly determined that Defendant Harroun—not the Plaintiff—instigated the interaction, escalated the interaction, and then proceeded to apply excessive force while placing her under arrest.

43.     Witness statements captured in Arapahoe County Sheriff's Office ("ACSO") incident reports indicate that Defendant Harroun was seen, consistent with the Plaintiff's own narrative of the incident, on top of the Plaintiff and striking her face, neck, and head with his closed fist multiple times while she lay on the ground screaming and crying.

44.     Officers also interviewed Defendant Harroun himself, who outright denied punching or striking the Plaintiff, despite ***multiple eyewitness accounts to the contrary*** and the Plaintiff's injuries which were consistent with blunt force trauma and strangulation.

45.     To be clear: the Defendant lied to law enforcement officers who arrived on the scene to investigate this matter in an attempt to avoid accountability for his unconstitutional conduct.

46.     These injuries—including extensive bruising on the Plaintiff's face from the closed fist punches and bruising around her neck from the strangulation—are well-documented and noted with a high degree of specificity by a range of medical professionals who provided care to the Plaintiff in the days, weeks, and months following this incident.

47.     Despite the fact that the Plaintiff stands just five feet four inches, is disabled, and was unarmed, Defendant Harroun, who stands over six feet tall and has a large, muscular build, also told investigating officers that he was in fear for his life.

48.     Clearly controverted by the evidence, Defendant Harroun attempted to justify his violent behavior post-hoc by representing that he took necessary and appropriate actions pursuant to his training as an APD officer.

49.     Acting pursuant to the APD's Off-Duty Directive, which authorizes officers to use discretion to "take official police action" to "protect life" and "prevent bodily injury", Defendant Harroun used his authority to respond to this incident not as a member of the public, but as an Aurora Police officer.

50.     Furthermore, the inadequate training and supervision, as detailed in this Amended Complaint, that Defendant Harroun received from Aurora influenced him to respond to this incident with excessive force.

**Ms. Martinez Suffered Significant Injuries as a Result of the Defendants' Actions and Aurora Police Department's Inadequate Training and Supervision and Culture of Police Violence**

51.     Some of the Plaintiff's injuries were immediately visible following the attack by Defendant Harroun.

52.     Witnesses and incident reports from the ACSO reveal that the Plaintiff's face and neck were red and swollen from the punches and subsequent strangulation.

53.     Witnesses also observed the Plaintiff limping and holding her head as she got off of the ground and waited to be transported to a nearby hospital.

54.     As testified to by responding ACSO Deputy Keith Basile during a preliminary hearing in Defendant Harroun's criminal case, just moments after the attack the Plaintiff already developed visible injuries, including "a small, raised bump on her forehead" and "some small lacerations on her left hand."

55.     Deputy Basile also testified that he witnessed the Plaintiff "hysterical, very upset, very emotional. She appeared to be in a lot of pain both emotionally and physically."

56.     Understandably, the Plaintiff was inconsolable owing to the extreme pain she was experiencing when others came to her aid, as evidenced by the witness statements accompanying this Amended Civil Rights Complaint and Jury Demand, and the reports by intervening law enforcement officers.

57.     Covered in mud, bleeding, crying uncontrollably, and inconsolable, the Plaintiff was transported to the Emergency Department at a nearby hospital for an assessment of her injuries. This would be only the beginning of the extensive treatment necessary to address her injuries.

58.     In the early morning hours of January 12, 2023, the Plaintiff received a forensic examination at UC Health by Chelsea Saldate, RN, who concluded that the Plaintiff sustained serious bodily injury ("SBI") as a result of Defendant Harroun's actions.

59.     Nurse Saldate testified during a preliminary hearing in Defendant Harroun's criminal case that during the examination, the Plaintiff "started crying, showing me how he was standing over her, putting his weight down onto her neck to strangle her, and then threatened to arrest her."

60.     Nurse Saldate further testified that the Plaintiff "had body abrasions. She had a bunch of oral petechiae and petechial hemorrhages within her oral cavity," indicating that there was "absolutely" pressure on the Plaintiff's neck during the assault. According to Nurse Saldate, "the petechiae in the oral cavity and the signs and symptoms that she had would tell me that she had strangulation with hypoxia, but moving forward, even more than that, the fact that she had incontinence of urine tells me that she had an anoxic event."

61.     As testified to by Nurse Saldate, an anoxic event, or loss of oxygen to the brain, can result in "permanent memory loss, unable to recall events. The brain cells never regenerate once they're lost."

62.     Nurse Saldate testified that she specifically found "petechiae inside [the Plaintiff's] lower lip. I saw petechiae in the frenulum, which is the part that attaches the lip to the

gums, petechiae inside her cheeks, and I saw petechiae in the middle of the oral pharynx, which is back in the very back of the throat behind the uvula."

63.     While Nurse Saldate did not see immediate bruising, she did observe swelling and dried blood on the Plaintiff's face.

64.     In the days that followed, the Plaintiff did have extensive visible bruising to her body.

65.     The following photos, taken during another exam days after the original incident reveal just some of the bruising the Plaintiff sustained to her face and neck from the closed-fist strikes and strangulation:



66.     The Plaintiff sustained serious damage to the left side of her torso as well—the side most affected by her CRPS—which is visible here:



67.     These are but just a few of the damages she suffered. Plaintiff has also suffered,

among other things, the following:

    a.  Traumatic brain injury;
    b.  Impaired vision;
    c.  Vision loss;
    d.  Anterior abdominal wall trauma;
    e.  Severe exacerbation of her CRPS—bilateral;
    f.  New manifestations of her CRPS—right side; and
    g.  Significant mental and emotional damages:
        i.  Nightmares;
        ii.  Night terrors;
        iii.  Severe anxiety; and
        iv.  PTSD.

68.     In the weeks that followed the attack, the Plaintiff continued to have trouble

breathing, chest pain, difficulty chewing, severe headaches, insomnia, changes to her vision,

cognitive dysfunction, psychological symptoms, sleep disturbance, and autonomic dysfunction.

Notably, for the very first time since her initial diagnosis, the Plaintiff now experiences bilateral

CRPS—focused on her right foot—as opposed to symptoms limited to just the left side of her body.

69.     After the incident on January 11, 2023, the Plaintiff has been forced to visit various Emergency Departments to seek care for: intense pain, neurogenic pain in her head and torso, vision loss, insomnia, and other ailments.

70.     Objective assessments on the Plaintiff revealed significant neurological symptoms and side effects as a result of the attack, including ongoing problems with her vision, cognition, and emotional regulation.

71.     As a result of this incident, the Plaintiff regularly experiences headaches that are so severe that they impact her ability to function in her day-to-day life.

72.     In the days and weeks following the attack, the Plaintiff was in such pain that she was unable to participate in activities which she previously used to manage her physical and mental health, including exercise and walking her dog, Argyle.

73.     Because the Plaintiff could not exercise for such an extended period of time, she experienced CRPS "flare-ups" and other complications which caused severe pain.

74.     The Plaintiff also began seeing a therapist following this incident owing to the trauma and emotional distress she suffered and continues to suffer.

**<u>Defendant Harroun Faces Criminal Charges for His Conduct</u>**[3]

---

[3] Despite exercising due diligence and obtaining all publicly-available information prior to the filing of this Civil Rights Complaint and Jury Demand through the Colorado Open Records Act and Colorado Criminal Justice Records Act, the Plaintiff is limited in obtaining some case-relevant documents because the criminal prosecution is ongoing. As a result, Plaintiff respectfully reserves the right to amend this document as new information becomes available.

75.     Defendant Harroun's use of force was investigated by the ACSO per policy given that he was actively working as an officer with the APD at the time of the incident.

76.     On January 11, 2023, Defendant Harroun was arrested for his unjustified use of force and booked into jail.

77.     At the time of this Amended Complaint, Defendant Harroun has been charged with the following crimes relative to his unconstitutional arrest and use of force against the Plaintiff:

      a.   Assault 1—Strangulation (F3)—CRS 18-3-202(1)(g)
      b.   Attempt to Influence Public Servant (F4)—CRS 18-8-306
      c.   Assault 3 (M1)—CRS 18-3-204(1)(a)

**Aurora Hired and Retained Defendant Harroun Despite His History and Warnings Regarding the Fact that he was Unfit for Duty**

78.     Prior to the incident involving the Plaintiff, just days before the facts giving rise to this case, the APD received a call-for-service at Defendant Harroun's residence, which indicated that he was unfit for duty and posed a risk to the community.

79.     This was following his placement on administrative leave following his role in an officer-involved shooting less than a month before the incident itself.

80.     During this incident, which occurred on December 31, 2022, just twelve days before the incident involving the Plaintiff, Defendant Harroun responded to a call for service and shot and severely injured another person of color. Defendant Harroun currently faces criminal charges for this incident as well.

81.     During the December 31, 2022, incident, Defendant Harroun used excessive force against a person of color who, similarly to the Plaintiff, did not possess any weapons and was not engaging in any aggressive posturing.

82.     Just as Defendant Harroun lied to responding ACSO deputies about his use of force against the Plaintiff, Defendant Harroun lied about the circumstances surrounding his decision to draw his service weapon and fire it during the December 31, 2022, incident, just two weeks prior.

83.     Nevertheless, Defendant Harroun, per the official policies and procedures of APD and support from the Civil Service Commission and senior decision-makers within APD, retained his badge and all the attending powers and authorities that come with it, including the authority and ability to detain civilians, effect an arrest, and use force while off-duty.

84.     Indeed, per training and policy at the APD, officers are aware that they should approach interactions with civilians as though they are "never off duty," and, in fact, are actively trained and encouraged to intervene and affect arrests while off-duty, including the use of force (or even deadly force) pursuant to the discretion of the individual officer.

85.     Defendant Harroun exhibited behaviors—both while on-duty amongst other officers and supervisors and in his private life—which obviated the fact that he was unfit for duty and incapable of exercising reasonable discretion with respect to the use of force.

86.     Given that in just the two weeks prior to the incident giving rise to this lawsuit Defendant Harroun engaged in violent behaviors on two separate occasions, Aurora—both senior decision-makers at APD and members of the Civil Service Commission—knew or should have known of his propensity for violence and using excessive force against members of the public such as the Plaintiff.

87.     Aurora's decision to hire and retain Defendant Harroun provided him with the opportunity to use his authority as a police officer to violate the constitutional rights of others,

and his propensity to misuse a weapon was reasonably foreseeable before Aurora hired him and during the course of his employment.

88.     Based on information gleaned through the criminal process pending against Defendant Harroun, and representations made by prosecutors regarding Defendant Harroun's background, it was "crystal clear" that there were objective indicators of Defendant Harroun's propensity for unwarranted violence prior to his hiring by APD. The fact that he was unfit to serve as a police officer, according to prosecutors, was so plainly obvious that any reasonable investigation into his background by APD and/or the Civil Service Commission would have revealed as much.

89.     On information and belief, based on information made available through the criminal case, both APD and the Civil Service Commission were actually aware of these serious "red flags," which made precisely the kind of excessive force against the Plaintiff only a matter of when, not if.

90.     In a report issued on April 15, 2023, the Aurora Independent Consent Decree Monitor recorded that the Civil Service Commission's decision to hire Defendant Harroun in 2020 was a "controversial issue." To be clear, this was not just a broader reflection on the hiring and retention processes relative to hiring and discipline by the Civil Service Commission and APD; instead, this was a commentary on the reckless decision to hire Defendant Harroun.

91.     Specifically, the report found that with respect to Defendant Harroun, "In 2020, the Civil Service Commission conducted hiring with no input from the agencies and unilaterally set cut-off scores on the written exam and acceptable minimum score for the job suitability assessment without agency input."

92.     In other words, the Civil Service Commission deemed Defendant Harroun fit for service in 2020, despite obvious and objective indicators via his results on the written examination and job suitability assessment during the hiring process alerting Commission members of his propensity for violence.

93.     The report further noted that during these discussions surrounding Defendant Harroun's violent attack on the Plaintiff and the role his hiring played into it, "particularly alarming" was a meeting of the Civil Service Commission wherein "there was a clear and vocal questioning from certain CSC Commissioners about whether CSC will comply with the requirements of the Consent Decree." The Consent Decree requires the Civil Service Commission to transfer its authority to have final say in APD hiring decisions to the APD itself.

94.     In sum, the Civil Service Commission knew that Defendant Harroun was not a suitable candidate and had a propensity for violence, hired him anyways, learned that he inevitably used his training and authority to attack and arrest the Plaintiff, and continued to demand it have sole power to hire APD officers.

**The Actions and Inactions of the City of Aurora Were Causal Factors in the Underlying Constitutional Violation**

95.     Defendant Harroun's treatment of the Plaintiff was engaged in pursuit of Aurora's training, custom, policy, and practice of unlawful conduct. Aurora's longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying the use of excessive force, particularly against people of color and individuals with disabilities, caused Defendant Harroun to use unlawful excessive force against the Plaintiff.

96.    Aurora police officers' unlawful conduct, including that of Defendant Harroun, as set forth in detail herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

97.    Aurora's unlawful customs, policies, and practices are demonstrated by its history of misconduct, brutality and race-based discrimination, as reflected in both a statistical analysis of its policing and by the many prior incidents involving APD officers engaging in such conduct. Accordingly, Aurora knew or should have known of the obvious risk of harm faced by people of color and individuals with disabilities when contacted by APD, yet the City took no or inadequate action to address such risk in the years leading up to Defendant Harroun's attack on the Plaintiff.

98.    Given APD's long history and widespread practice of APD officers using excessive force against people, particularly people of color and individuals with disabilities, Aurora knew or had constructive knowledge that its officers used excessive and unnecessary force and/or would be influenced by racial bias or an inability to competently navigate interactions with individuals with disabilities when contacting members of the community, and that such bias could cause the APD officers to utilize excessive and unnecessary force against Hispanic and/or disabled people like the Plaintiff.

99.    In light of this knowledge, Aurora and its Chief of Police could have and should have pursued reasonable methods for training and supervising APD officers, including Defendant Harroun, in interacting with people of color and disabled people, and the appropriate use of force, but it failed to do so.

100.     Regarding training and supervision, Aurora trained and encouraged officers to default to the use of the maximally permitted level of force rather than non-force alternatives and to use force whenever force could be legally justified, rather than limiting the use of force for when force is necessary.

101.     Regarding hiring, investigation, and discipline, Aurora gives virtually unbridled authority to the Civil Service Commission. As found in the Colorado Attorney General's report of its 14-month investigation into the APD ("AG's Report"), released in 2021, "…the Aurora City Charter gives the Civil Service Commission total control over entry-level hiring and the right to reverse all meaningful discipline that the Chief of Police can impose." Furthermore, the AG's Report found that the Civil Service Commission operates in such a way that "Aurora Police officers who violate law or policy often remain on the force" and that due to its hiring practices, "Aurora Police officers do not reflect the diversity of the city."

102.     Put simply, the AG's Report concluded that "[m]ost failures with Aurora Police relate to systemic and severe culture problems."

103.     Aurora, through the Civil Service Commission, persistently failed to meaningfully investigate and discipline numerous APD officers for their similar uses of excessive force, especially those against people of color and disabled individuals.

104.     The Civil Service Commission's failure to find officer wrongdoing and failure to discipline officers in this case and in the cases described below and others reflects a custom, policy, and/or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct. These encouragements, toleration of, and ratifications demonstrate that such police misconduct is carried out pursuant to the policies of and regimen of training provided by Aurora,

that such conduct is customary within APD, and were the moving force behind Defendants violating the Plaintiff's rights.

105.     Aurora's unlawful customs, policies, and/or practices are demonstrated in numerous ways, including through statistics showing that APD officers are more likely to use force against people of color, notwithstanding the fact that people of color comprise a minority of the Aurora population.

106.     For example, between 2015 and 2019, Black individuals accounted for nearly 40% of all reported arrests in Aurora. Yet, according to the U.S. Census Bureau, as of July 1, 2019, Black individuals made up less than 17% of Aurora's population. This means that from 2015 to 2019, the relative proportion of APD arrests involving Black subjects was approximately **2.5 times higher** than would be anticipated based on the relative percentage of Black individuals in Aurora's population alone.

107.     Between 2018 and 2021, APD arrested the equivalent of 27.8% of Aurora's Black population compared to just 11.2% of Aurora's White population. In other words, based on relative population percentages, APD arrested people of color more than **1.4 times more** than white individuals. That multiplier was even greater for Black individuals, who were arrested **almost 2.5 times more** (27.8%) than white individuals (11.2%) based on relative population percentages.

108.     Statistical analysis of APD's history with Black individuals also demonstrates the widespread, systemic nature of APD's unlawful pattern of using force against people of color. The statistics bear out statistically significant racial disparity exists in APD's use of force against people of color.

109.    Between 2015 and 2020, while Black citizens made up just 16.5% of the population of Aurora, Black citizens were subject to use of force in 45.9% of all incidents. The reverse disparity existed for White/***Non-Hispanic*** citizens, with force being used against individuals in that group in a relatively low proportion.

110.    The disparities in the uses of force against people of color compared to white people are statistically significant and cannot be explained by random chance or any other factors that critics might suggest, including geography, gender, income, and/or severity of crime.

111.    Aurora's unlawful customs, policies, and/or practices are demonstrated by many incidents of brutality by APD, especially against people of color.

112.    For example, on August 2, 2020, five APD officers seized Brittany Gilliam and four children, all of whom are Black, by pointing loaded guns at them and forcing them out of their legally parked vehicle without any probable cause or reasonable suspicion that they committed a crime. Ms. Gilliam took the four young children to get their nails done, but the nail salon was closed when they arrived. As Ms. Gilliam legally parked her car in the salon's parking lot to look for another nail salon, APD officers misidentified Ms. Gilliam's vehicle as stolen when they pulled up behind her and immediately exited their patrol car with their guns drawn and pointed at Ms. Gilliam's vehicle. The APD officers ordered Ms. Gilliam and the children (who were six, twelve, fourteen, and seventeen years old) out of the car at gunpoint and demanded that they lay on their stomachs on the pavement. Once Ms. Gilliam and the girls were in handcuffs and lying face-down on the ground, a male officer  patted each of the young girls down while female officers stood and watched. Numerous APD officers arrived at the scene, and at one point as many as fourteen APD officers were present. The deplorable fact that multiple

Aurora police officers held innocent Black children handcuffed and at gunpoint, and multiple other officers did not intervene, is evidence of the profound and systematic problem of racism and brutality within the APD. Ms. Gilliam and the children currently have a lawsuit pending in Arapahoe County District Court.

113.    On March 1, 2020, an APD officer confronted Dr. P.J. Parmar, a person of color, when Dr. Parmar arrived at his business. As Dr. Parmar drove up to his garage, he found an APD officer parked on his property. Dr. Parmar stopped immediately and honked. At that point, the officer jumped out of his car and swore at Parmar. The officer then pulled out his gun while running toward Dr. Parmar's car. The officer pointed his gun at Dr. Parmar's head without having any reason to believe that Dr. Parmar was committing or had committed a crime or posed any threat to the officer or anyone else. Dr. Parmar calmly and repeatedly asked the officer to leave his property, to which the officer repeatedly demanded—without any legal justification—that Dr. Parmar prove that it was his property. Instead of leaving, the officer called in two other APD officers. APD had no reasonable suspicion much less probable cause for its officer's seizure of Dr. Parmar, which was clearly motivated by racial profiling. Dr. Parmar has a lawsuit currently pending in the District of Colorado.

114.    On August 27, 2019, APD Officer Levi Huffine arrested Shataeah Kelly for a suspected municipal code violation. Officer Huffine handcuffed and shackled Ms. Kelly and left her lying down, hobbled, in the back of his patrol car while he drove her to the police station. At some point, Ms. Kelly slipped off the seat such that her head and chest were inverted, and she was half upside down on the floor of the patrol car, in a dangerous and exceedingly uncomfortable position. She repeatedly begged Officer Huffine for help, telling him that she

could not breathe, that her neck was breaking, and that she didn't want to die this way. Officer Huffine ignored her pleas, leaving her in the dangerous, painful position for approximately 21 minutes.

115.    On August 24, 2019, Elijah McClain was listening to music, enjoying the short walk home from the corner store where he had bought some iced tea, when Aurora police officers grabbed, tackled, and assaulted him. Officers brutalized Mr. McClain for nearly eighteen minutes—approximately fifteen minutes of which he was handcuffed and lying on the ground, completely under the officers' control. The force that Aurora officers used against Elijah included compressing his neck and the blood flow to his brain with two consecutive carotid holds, cranking his left shoulder with an armbar hammerlock that caused it to repeatedly pop, and, even after he was handcuffed with his hands behind his back, continuing to crush him under the weight of their bodies and slamming him to ground when he arched up slightly to vomit or in response to the pain. One officer also jammed his knee into Elijah's arm for minutes on end, with the sole purpose of inflicting pain by forcefully separating Elijah's bicep and triceps muscles. All the while, the officers terrorized Elijah with additional threats that they would tase him and sic a police dog on him. As Elijah McClain lay handcuffed, in his own vomit, on the ground, under the hundreds of pounds of combined weight of APD officers, Aurora Fire Rescue paramedics involuntarily injected him with a massive dose of ketamine. Minutes after the injection, paramedics noticed that he was not breathing and had no pulse. Elijah McClain never regained consciousness and was declared dead a few days later. APD investigated its officers' conduct, but as is customary, found no wrongdoing. As discussed in greater detail below, subsequent reviews and investigations into Elijah's murder by APD officers reveal how deeply rooted the

racism and use of excessive force is within APD. Elijah's Mother, Estate, and biological father brought a suit against Aurora which resulted in an eight-figure settlement.

116.    On June 30, 2020—shortly after news of Aurora's murder of Elijah McClain gained international prominence—Chief Wilson announced that multiple APD officers, including several who had participated in the use of force against Mr. McClain were the subjects of a completed internal affairs investigation that had revealed that many months earlier, those officers had returned to the scene of Mr. McClain's killing to take photographs of themselves, in uniform, re-enacting elements of that use of force. The photos included mimicry of the carotid chokeholds employed by APD officers against Mr. McClain and emulated the American racist tradition of white people taking photos of themselves at the scenes of lynching. The actions of these officers in creating and distributing smiling photos of themselves reenacting that chokehold at the site of Mr. McClain's killing by APD officers demonstrate that rank-and-file APD officers operate under the assumption that racist behavior will be tolerated or approved of by their colleagues and superiors. Indeed, the officers were so unafraid of professional consequence for their racist mockery of Mr. McClain's killing that they freely distributed their photos to other APD officers—again, emulating the tradition of white people turning the photographs of themselves at lynchings into so-called "lynching postcards" to be mailed to friends and family. Although APD fired the involved officers, the fact that some of those same officers were never disciplined for their actions (and inactions) that caused Elijah McClain's death shows Aurora's preoccupation with harm to the reputation of its police force rather than the harm that its officers cause to the Aurora community.

117.    Also subsequent to Mr. McClain's death gaining international attention, on June 27, 2020, thousands of protesters gathered at the Aurora Municipal Center—which houses APD headquarters—to protest his killing and to celebrate Elijah's life with a peaceful violin vigil. In a bizarre and unwarranted display of force, dozens of APD officers clad in riot armor and openly displaying weapons appeared at the peaceful protest. Though the protesters posed no threat to the APD officers, the officers began using force against protesters, including the use of batons, pepper spray, and smoke grenades. Video shows terrified protesters fleeing from the onslaught of heavily armored APD officers, even as a group of violinists peacefully played an improvised melody in Mr. McClain's honor. No officers were disciplined for their conduct during the protest. A class action lawsuit against Aurora and the involved officers is pending.

118.    On November 21, 2018, Jamie Alberto Torres was fixing a car in his garage with friends when a neighbor complained about noises coming from the garage. APD officers came to Mr. Torres' home solely to investigate this noise complaint, and one of the officers illegally ordered Mr. Torres to exit his garage, threatening to take him to jail. Because Mr. Torres paused momentarily before complying with the illegal order, the officer grabbed Mr. Torres, wrenched his arm behind his back, picked him up, and slammed him to the ground. Even after handcuffing Mr. Torres, the officer continued to attack Mr. Torres by slamming him to the ground again and wrenching his arm behind his back multiple times. During this encounter, Mr. Torres repeatedly screamed in pain. To justify their illegal conduct, the APD officers charged Mr. Torres with resisting arrest and failure to obey a lawful order. A jury found that Mr. Torres was not guilty of these charges at trial. APD investigated its officers' use of force against Mr. Torres but found no

wrongdoing. Aurora settled a lawsuit based on this incident, claiming unlawful seizure, excessive force, and racial bias.

119.    On September 6, 2018, APD officers used excessive force when, after responding to a car accident involving Andre Williams, a Black man, the officers beat and tased Mr. Williams for not responding immediately to their orders. Even though Mr. Williams showed no signs of aggression or attempting to flee, and, in fact, was having a seizure, the officers took him to the ground. Then, after Mr. Williams had complied with an order to get on his stomach and was surrounded by at least three APD officers, the officers punched him in the head, struck his legs with their knees, and tased him twice. Mr. Williams filed a lawsuit based on this incident, claiming excessive force and racial bias, among other things.

120.    On July 13, 2017, one APD officer choke-slammed—put his hand around her neck and threw her to the ground—Vanessa Peoples, a Black woman, while police were performing a welfare check in her home. Several other APD officers then piled on Ms. Peoples. What "provoked" the officers' attack was Ms. Peoples' protestations of the officers' misconduct and her failure to be 100% compliant with every single police directive (legal or illegal). Eventually, the officers hog-tied Ms. Peoples so tightly that they dislocated her shoulder. Despite Ms. Peoples' continued cries of pain, APD officers kept her hog-tied for 30 minutes with her shoulder dislocated. APD officers had no reason to believe Ms. Peoples had committed a crime, yet they charged her with obstruction. Those charges were later dismissed. Aurora did not discipline any of the involved officers for their unconstitutional actions.

121.    On April 22, 2017, multiple APD officers responded to a car accident that involved Brandon Washington, a person of color. When Mr. Washington, who had hit his head

on his vehicle's steering wheel during the crash, dazedly attempted to stand up out of his vehicle, the officers used excessive force by tasing him repeatedly and subjecting him to a variety of other unwarranted physical force. Aurora did not discipline any of the involved officers for their unconstitutional actions. Mr. Washington filed a lawsuit based on this incident, claiming excessive force and racial bias, among other things.

122.    On September 14, 2016, an APD officer used unwarranted excessive force against Dennis Seabaugh while Mr. Seabaugh was detained in an Aurora jail cell. After getting frustrated with Mr. Seabaugh's repeated but ineffectual attempts to hang himself by tying a t-shirt around his neck, the officer stormed into the cell, and without providing Mr. Seabaugh reasonable warning, command, or an opportunity to comply, the officer got on top of Mr. Seabaugh and smashed his head down while simultaneously applying his body weight to pin Mr. Seabaugh down. The officer then smashed Mr. Seabaugh's face into a bench in the cell multiple times, while yanking on his arms; ultimately, the officer used so much force pulling on one of Mr. Seabaugh's arms that he broke Mr. Seabaugh's humerus bone. Aurora settled Mr. Seabaugh's excessive force lawsuit based on the incident.

123.    On June 29, 2015, APD officers used excessive force against Jeffrey Gale, an unarmed Black man, after a bystander called 911 to report that Mr. Gale had attempted to steal someone's wallet. The bystander reported to the 911 dispatcher that no physical force, threats, or weapons were used in the attempted theft. Mr. Gale was 49 years old, 5'7", weighed approximately 150 pounds, and suffered from gout in both ankles. After locating Mr. Gale, two APD officers handcuffed him then forced him to the ground, kicking him in the head and back. Five more APD officers joined in to hogtie Mr. Gale. After he was handcuffed, hogtied, and

lying face-down on the ground, the officers tased Mr. Gale at least three times, both in the back of his ribs and the back of his head. Mr. Gale was crying out in pain and begging for the officers to stop. One officer responded to his cries of pain by saying, "You better shut the fuck up or this is going to get really ugly for you." Aurora settled an excessive force lawsuit brought by Mr. Gale based on this incident.

124.    On March 6, 2015, an Aurora police officer used excessive force in the unjustified shooting and killing of Naeschylus Vinzant-Carter, an unarmed Black man. Mr. Vinzant-Carter was being pursued by Aurora's SWAT team, near an elementary school, when he was confronted. One officer then opened fire, killing Mr. Vinzant-Carter. Aurora paid $2,600,000 to settle Mr. Vinzant-Carter's claims. Upon information and belief, Aurora did not discipline any of the involved officers for this use of excessive force.

125.    On September 25, 2014, an APD officer used excessive force in arresting Cory Scherbarth by using a leg sweep to drop Mr. Scherbarth to the ground despite his lack of aggression toward the officer or anyone else, but rather in response to Mr. Scherbarth's non-threatening questioning of the officer about his intentions. After Mr. Scherbarth was handcuffed with no resistance, while he was lying on his stomach, APD officers slammed his head into the ground and punched him in the face, and one officer pressed his body weight down against Mr. Scherbarth with his knee against Mr. Scherbarth's shoulder.

126.    On July 8, 2014, APD officers used excessive force against Gaye O'Malley, a 55-year-old Black woman, after she called 911 to request medical assistance for her friend who had fallen and injured herself at home. Without justification, an APD officer took Ms. O'Malley to the ground using an "arm drag takedown," a "twist-lock," and a "prone control hold." The APD

officer had a history of unusually aggressive conduct toward citizens, particularly Black people. Ms. O'Malley was handcuffed, arrested, removed her from the home, and charged with assault, battery, obstructing a police officer, resisting arrest, and obstructing municipal operations. Aurora later settled a lawsuit brought by Ms. O'Malley.

127.    On July 3, 2014, APD officers used excessive force against Adam Bentz in response to his peacefully using his cellphone to record what he perceived as APD unlawfully towing his vehicle. Despite the fact that there was absolutely no indication that Mr. Bentz posed any physical threat to APD officers or anyone else, an APD officer grabbed Mr. Bentz around his neck, applied constricting pressure, and took Mr. Bentz down to the ground. The APD officer maintained the hold of Mr. Bentz's neck for 80 seconds while other APD officers restrained Mr. Bentz's limbs, leading Mr. Bentz to lose consciousness and stop breathing, although he was later revived. The force used against Mr. Bentz far exceeded that necessary to arrest him. Aurora later settled a lawsuit brought by Mr. Bentz asserting excessive force.

128.    On December 18, 2010, Aurora police officers used excessive force in their brutal treatment of Rickey Burrell, a Black man lying helpless in his bed after suffering a seizure. The officers had responded to a 911 call from Mr. Burrell's family. Rather than render assistance, Aurora officers inexplicably jumped on Mr. Burrell, wrenched his arm behind his back, and handcuffed him. The officers proceeded to roughly drag Mr. Burrell outside, though he was clad only in underwear that he had soiled during his seizure. Mr. Burrell suffered a wrist fracture and other injuries to his back and shoulder as a result of the officers' actions.

129.    This consistent pattern of unconstitutional police behavior, all or nearly all of which was claimed by Aurora itself to be within its authorized and approved policies, training

and customary practices, raises a more than plausible and compelling inference of racially-biased policing and failure to comply with constitutional limitations on seizures and searches. Further, they reflect a marked failure to develop sufficient training or practices regarding interacting with individuals with disabilities. Evidence of these other wrongs as set forth herein is legally admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

130.    Importantly, these patterns extend to officers who are technically off-duty but nevertheless taught—through formal policies, training academy and orientation, in-service training, on-the-job training, and as imbued through the general culture of APD—that officers are to conduct themselves as if they are "never off-duty," leading to the inevitable result that the failures in training, policy, supervision, and the like relative to the use of force and race-based policing will extend to officers who are not technically in uniform and working on a regular shift.

### Independent Investigation of Elijah McClain's Death Revealed Training and Supervision Weaknesses in Aurora, and the Colorado Attorney General's Office Found a Pattern and Practice of Racially Biased Policing and Excessive Force

131.    Aurora's deliberate and conscious failure to correct prior constitutional violations based on similar conduct constitutes an affirmative choice to ratify the conduct and sends a clear message to officers that such misconduct is acceptable and approved. It is Aurora's responsibility to properly train its officers to ensure they perform their duties correctly and to discipline, rather than ratify and encourage, their improper conduct, so that officers can learn from their mistakes and the mistakes of their colleagues and be deterred from engaging in misconduct that violates the constitutional rights of people with whom the police interact. Aurora's failure to do so has

clearly communicated to APD officers that excessive force, especially against the BIPOC community, as well as racially biased policing, is authorized and tacitly (or explicitly) encouraged.

132.    Aurora's past ratification and toleration of similar illegal conduct thus caused and was the moving force behind Defendant Harroun's use of excessive force against the Plaintiff.

133.    Indeed, Aurora knew that its training and policies were a causal factor and substantially certain to cause Aurora police officers to violate individuals' constitutional rights, like the Plaintiff, because the APD has been under significant scrutiny for some time, and numerous investigations have reached the same conclusions regarding Aurora's need for better training and supervision in the areas of use of force and avoiding racially biased policing. Yet, Aurora was deliberately indifferent to the need to change its training.

134.    In July 2020, Aurora City Council commissioned an independent investigation into Elijah McClain's death ("2020 McClain Investigation"). On February 22, 2021, the 2020 McClain investigators released a report and issued several recommendations to Aurora for changes in the policies and practices of the APD which highlighted Aurora's training and/or supervision weaknesses.[4]

135.    The 2020 McClain Investigation raised concerns about whether APD officers have sufficient guidance on the need to reassess the necessity and amount of any use of force once the level of threat and resistance is reduced and recommended that APD thoroughly review

---

[4] https://cdn5-hosted.civiclive.com/UserFiles/Servers/Server_1881137/File/News%20Items/Investigation%20Report%20and%20Recommendations%20(FINAL).pdf

its use of force policy which simply instructed officers that they could use force as permitted by Colorado statute—the same policy in effect when the Plaintiff was assaulted.

136.    In 2021, after several high-profile police abuse incidents, including the killing of Elijah McClain, the Colorado Attorney General's Office launched a pattern and practice investigation into the City of Aurora's Police and Fire Departments.

137.    On September 14, 2021, the Colorado Attorney General's Office released an alarming report ("AG's Report") finding that (1) Aurora Police has a pattern and practice of engaging in racially biased policing against people of color; and (2) the Aurora police department has a pattern and practice of using force excessively.[5]

138.    The Colorado Attorney General's Office determined that the cause of the APD's widespread pattern and practice of excessive force, including disproportionate and excessive force against its minority residents, can be reduced to several discrete factors: the APD (1) embraces a culture in which legal justification for force rather than necessary force is emphasized, (2) its policies focus on the maximum permissible force, (3) de-escalation is misunderstood and not consistently practiced (4) mental health issues are not adequately addressed, (5) all force is disproportionately used against people of color, (5) use of force incidents are inadequately documented, and (6) the Aurora Police Department and Aurora Fire Department do not adequately coordinate.

139.    In short, Aurora has failed to create and oversee appropriate expectations for responsible behavior, which has resulted in numerous well-documented unconstitutional practices and customs including: (1) quickly engaging in physical force despite it being

---

[5] https://coag.gov/app/uploads/2021/09/Pattern-and-Pracice-Investigation-Report.pdf.

unnecessary; (2) focusing on control and submission when engaging with individuals, and this emphasis on control also led to encounters escalating quickly; (3) taking subjects to the ground' quickly, often for minor reasons, which arises out of a perceived need to immediately take control of situations and establish dominance in interactions with citizens; (4) reciting "stop resisting" reflexively during encounters even when the body-worn camera videos do not show resistance.

140.    Aurora trained its officers that "de-escalation" refers to an officer's conduct following a use of force rather than an attempt to avoid using force at all. This approach is widely condoned by APD leadership. Indeed, during Force Review Board meetings, members applauded de-escalation that occurred after officers tased or tackled someone, rather than focusing on whether the taser or tackle was necessary in the first instance.

141.    Aurora is unquestionably the driving cause of the Plaintiff's assault, as nearly every bad practice endemic to the APD was realized when Defendant Harroun violently attacked the Plaintiff.

142.    For example, the Colorado Attorney General's Office determined that APD has a pattern and practice of using force excessively and officers often approach scenes with a show-of-force mentality, using threatened force often disproportionate to the risk presented. Defendant Harroun immediately tailed the Plaintiff in his vehicle and made threatening, aggressive statements and movements toward her. He then, without warning, grabbed and twisted the Plaintiff's arm while punching her in the face, despite that she was alone, unarmed, and had not committed any crime.

143.    Aurora also has a pattern and practice of officers using force to take people to the ground without first giving them adequate time to respond to officer commands. The Colorado Attorney General's Office found that this behavior arises out of a perceived need to immediately take control of situations and establish dominance in interactions with members of the community.

144.    Again, Defendant Harroun, without giving the Plaintiff an opportunity to comply with any lawful command, simply took the Plaintiff to the ground and immediately reverted to using extraordinary force against her.

145.    The APD was also determined to frequently employ force in situations where the alleged suspect had committed no crime other than failure to obey the officer: The Colorado Attorney General's Office documented several incidents illustrating this problematic and unconstitutional process, including cases where the use of force appeared retaliatory.

146.    In this matter, it is still unclear what crime the Plaintiff could have conceivably committed; nevertheless; Defendant Harroun approached the situation with a show-of-force mentality and then immediately reverted to closed-fist punches without warning, influenced and indeed instructed by the culture of Aurora, vis-à-vis its hiring and investigation, supervision, training, and discipline policies and practices to do so.

147.    Aurora's policy of failing to act in the face of a long history of excessive force against people, particularly within communities of color and among disabled people, and its custom, policy, and practice in failing to properly train and supervise its employees despite such history and knowledge or constructive knowledge of such history, were the moving force and proximate cause of Defendant Harroun's violation of Plaintiff's constitutional rights.

148.    Aurora's acts and/or omissions caused the Plaintiff significant damages.

149.    Aurora's actions, as described herein, deprived the Plaintiff of the rights, privileges, liberties, and immunities secured by the Colorado Constitution.

150.    The AG's Report and 2020 McClain Investigation noted several changes needed to remedy and eliminate Aurora's practice of race-based policing, stating that "Aurora must make major changes across the organization to improve its culture, including improving its policies, training, recordkeeping, and hiring."

151.    Importantly, the recommended changes all relate to causal factors that result in Aurora Police, such as Defendant Harroun, violating the law.

### Aurora's Police Academy and In-Service Trainings were the Moving Force and Causal Factors Behind Defendant Harroun Violating Ms. Martinez's Constitutional Rights

152.    Aurora operates its own police academy that all officers hired into the APD—both entry-level and lateral—must complete.

153.    Through training used for many years—some of which is still ongoing—Aurora teaches officers to use aggressive tactics.

154.    In 2020, APD leadership acknowledged that Aurora police academy training has historically been militaristic.

155.    Aurora trains officers on what is permissible rather than what is proper, which is a chief contributor to its officers' violations of the law, including the violations to the Plaintiff.

156.    Despite several investigations recommending the need to reevaluate APD's Use-of-Force Policy, the policy remained the same for many years, which simply instructed officers that he or she could use force as permitted by Colorado statute.

157.    Aurora officers are not sufficiently trained to utilize arrest control techniques and attempt to use tactics beyond their fitness and skill level, which results in a widespread pattern and practice of unjustified, excessive force. This insufficient training was a causal factor in the Plaintiff's assault.

158.    Aurora officers have historically demonstrated that they are not trained to properly use arrest control techniques, particularly martial arts techniques, to effectuate arrests, as numerous officers have demonstrated that they do not know how to respond in critical incidents when they appear to panic rather than control the encounter.

159.    APD in-service training is *ad hoc* and does not address specific needs of the organization as shown by officer behavior.

160.    Defendant Harroun was inadequately trained, which contributed to his inappropriate and excessive force. By way of only a few examples of Defendant Harroun's inadequate training: (1) Defendant Harroun used force when no crime had been committed by the Plaintiff or she otherwise posed no threat to himself or others; (2) Defendant Harroun continued to use force on the Plaintiff even after she was subdued; (3) Defendant Harroun failed to respond appropriately when he learned of the Plaintiff's disability; and (4) Defendant Harroun acted as expected of an untrained officer in an emotional state.

161.    The responsibility for inadequate and outdated policies and training in effect at the time of the Plaintiff's assault fall directly upon the City of Aurora. This is particularly odious in view of Elijah McClain's Death Investigation and Report findings as well as the AG's Report of the Aurora Police Department and Aurora Fire Rescue and Consent Decree.

162.    With insufficient training, officers are unequipped to effectuate arrests without resorting to dangerous tactics like those used by Defendant Harroun.

**Aurora is Subject to a Consent Decree Targeting its Pattern and Practice of Racially Biased Policing and Excessive Force**

163.    The City of Aurora is now subject to extensive policy development and implementation requirements related to its policies affecting, among others, racial bias in policing, use of force, and documentation of law enforcement stops of residents.

164.    The Consent Decree aims to ensure that "that [t]he City shall change, in measurable ways, how Aurora Police engages with all members of the community, including by reducing any racial disparities in how Aurora Police engages, arrests, and uses force in the community."

165.    The policies subject to revision by court order are, of course, the policies that were in effect on the day that Defendant Harroun attacked the Plaintiff.

166.    The fact that these policies are specifically subject to revision and amendment by the Consent Decree demonstrates the degree to which the City previously failed to implement policies and practices that would protect citizens, like the Plaintiff, from the use of excessive force. Aurora's constitutionally inadequate policies and practices, as well as its failure to adequately hire, train, supervise, investigate, and discipline indubitably led to the abuses suffered by the Plaintiff.

167.    What is most shocking about the excessive and unwarranted force utilized against the Plaintiff in this matter is the extent to which it was preventable by a wide host of easily-implemented and obvious reforms by the City of Aurora—reforms to hiring, supervision, discipline, authority granted to off-duty officers, authority granted to officers on administrative

leave, training relative to the use of force, training relative interacting with people with disabilities, and the like.

168.     Each and every one of these failures on the part of the City of Aurora represents a "causal factor" in the brutal attack perpetrated by Defendant Harroun against the Plaintiff in this matter.

## V.  CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Excessive Force**
**Violations of the 4th Amendment**
(Plaintiff Against Defendant Harroun)

169.     Plaintiff hereby incorporates all other paragraphs of this Amended Civil Rights Complaint and Jury Demand as if set forth fully herein.

42 U.S.C. § 1983 provides:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

170.     Defendant Harroun is a person for purposes of 42 U.S.C. § 1983.

171.     Defendant Harroun, at all times relevant to this action, was acting under the color of state law in his capacity as an Aurora police officer, and his acts and/or omissions were conducted within the scope of his official duties and employment.

172.    At the time of the complained of events, the Plaintiff had a clearly established constitutional right under the Fourth Amendment to be secure in her person from unreasonable seizure through excessive force by law enforcement.

173.    Any reasonable police officer knew or should have known of this right at the time of the complained of conduct as it was clearly established at that time.

174.    Defendant Harroun engaged in the use of force that was objectively unreasonable in light of the facts and circumstances confronting him thereby violating the Plaintiff's Fourth Amendment right to be free from excessive force.

175.    As described in more detail above, it was not objectively reasonable for Defendant Harroun to physically assault, strangle, subdue, and attempt to arrest the Plaintiff in the absence of any conduct or information indicating she committed a crime, notwithstanding whether he was frustrated with her seeming violation of a "leash" rule articulated by her apartment complex or that she lawfully carried pepper spray for purposes of self-defense.

176.    The acts or omissions of Defendant Harroun were the legal and proximate cause of Plaintiff's damages.

177.    As a proximate cause and result of Defendant Harroun's unlawful conduct, Plaintiff has suffered actual physical bodily and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, excruciating pain, and severe emotional distress.

178.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

179.     As a direct and proximate result of the acts, omissions, and violations alleged above, the Plaintiff suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

180.     In addition, Plaintiff is entitled to punitive damages against Defendant Harroun, in that his actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Unlawful Seizure / False Arrest
### Violations of the 4th Amendment
(Plaintiff Against Defendant Harroun)

181.     Plaintiff hereby incorporates all other paragraphs of this Amended Civil Rights Complaint and Jury Demand as if set forth fully herein.

182.     Defendant Harroun was acting under color of state law with respect to his actions and inactions at all times relevant to this action.

183.     At no relevant time did Defendant Harroun have probable cause or reasonable suspicion, or any other legally valid basis, to believe that the Plaintiff had committed or was committing any violation of the law prior to seizing and continuing to illegally restrain her person.

184.     At no relevant time did Defendant Harroun have a reasonable basis for believing that Plaintiff was an imminent danger to herself or others. No exigent circumstances existed justifying the Defendant's unlawful seizure of the Plaintiff.

185.     At no relevant time did Defendant Harroun have a warrant authorizing seizure of the Plaintiff's person.

186.     During the seizure, as described in more detail above, the Defendant intentionally, forcefully, and violently restrained the Plaintiff's person against her will, despite lacking any legally valid basis for his actions.

187.     Defendant Harroun's actions were objectively unreasonable in light of the circumstances confronting him, and violated clearly established law, which a reasonable official in his position would have known.

188.     Defendant Harroun engaged in these unlawful actions intentionally, willfully, and wantonly.

189.     As a direct and proximate result of the acts, omissions, and violations alleged above, the Plaintiff suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Failure to Hire, Investigate, Train, Supervise, and Discipline**
***Monell* Claim**
(Plaintiff Against Defendant Aurora)

190.     Plaintiff hereby incorporates all other paragraphs of this Amended Civil Rights Complaint and Jury Demand as if set forth herein.

191.     Aurora failed to properly train, supervise, and discipline its employees, including Defendant Harroun, with respect to the use of force and his responsibilities relative to off-duty interventions and interactions with people of color and individuals with disabilities.

192.     Aurora further failed to properly train, supervise, and discipline its employees, by inculcating a responsibility on the part of the officers—through formal policy, training, and actual practices and habits within the department—to actively seek out potentially dangerous

and violent interactions while off-duty by implementing and endorsing a "never off-duty" approach to interacting with individuals in the community, the consequences of which result in increased incidents of unwarranted and unnecessary force against people of color and individuals with disabilities.

193.    Aurora, through the Civil Service Commission, failed to hire officers, specifically including Defendant Harroun, as evidenced by the information gleaned through the criminal process and the observations of the Office of the Independent Monitor, in a manner that would not lead to the deprivation of the Plaintiff's constitutional rights.

194.    Aurora gave hiring autonomy to the Civil Service Commission, who in turn hired Defendant Harroun despite his poor testing results during the hiring process making it plainly obvious that he was an unfit candidate and had a propensity for violence.

195.    Aurora, through the Civil Service Commission, also failed to discipline officers in a manner that would not lead to unlawful uses of force. The Civil Service Commission overturns disciplinary decisions recommended by the Chief of Police in such a way that officers who violate the law remain on the force, thereby ratifying APD officers' uses of excessive force.

196.    Aurora also reinstates officers who resign from the APD in lieu of termination due to using excessive force in the course of their employment, provided that "the officer was in good standing at the time of their separation from APD and still meets the minimum qualification for hiring." One such reinstatement occurred in December 2022, after an officer who was directly involved in the death of Elijah McClain resigned during an investigation into his actions in July 2021. Instead of recognizing the grave danger his presence as an APD officer

posed and the potential for the officer to engage in unconstitutional actions again, Aurora welcomed him back with open arms.

197.    These actions and inactions in hiring and discipline send a signal that Aurora not only tolerates, but actually endorses and awards officers who use excessive force.

198.    Aurora's failure to, in its supervisory duties, adequately investigate and hire, train, supervise, and discipline its officers with respect to the use of excessive force is a custom, policy, and/or practice of Aurora and a moving force behind the constitutional violations described herein.

199.    The constitutional violations—federal and state—perpetrated against the Plaintiff in this matter were a foreseeable consequence of Aurora's actions and inactions.

200.    Aurora was deliberately indifferent to the constitutional rights of its citizens by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force, aggressive off-duty policing, and interacting with people of color and people with disabilities. Aurora could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

201.    Aurora's policies, customs, and/or practices in failing to properly monitor, train, supervise and discipline its employees were the causal force and proximate cause of the violation of the Plaintiff's federal and state constitutional rights.

202.    The acts or omissions of Aurora caused Plaintiff damages in that she suffered extreme physical injuries and pain and extensive emotional and mental suffering during and after the assault.

203.    The actions or omissions of Aurora as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused her other damages.

**FOURTH CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 13-21-131**
**Colo. Const. Art. II, Section 7 —** *Excessive Force*
(Against Defendant Harroun)

204.    Plaintiff hereby incorporates all other paragraphs of this Amended Civil Rights Complaint and Jury Demand as if set forth herein.

205.    At all relevant times, Defendant Harroun was a "peace officer" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

206.    At all relevant times, Defendant Harroun was acting under color of state law in his capacity as an Aurora Police Department law enforcement officer.

207.    Plaintiff has a protected interest under Colorado Constitution Article II, Section 7, in being free from the use of excessive force by law enforcement personnel.

208.    Defendant Harroun violated Plaintiff's state constitutional rights by using objectively unreasonable force against Plaintiff.

209.    Defendant Harroun seized Plaintiff by means of unreasonable physical force including but not limited to improper arrest control techniques, punching the Plaintiff in the face and neck numerous times with a closed fist, strangulating the Plaintiff, and violently subduing the Plaintiff on the ground despite the fact that she was not resisting.

210.    Defendant Harroun had no reasonable basis to believe Plaintiff posed a threat of harm to him or any other person.

211.    Defendant Harroun did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

212.    Defendant Harroun's use of force against Plaintiff, as described herein, was objectively unreasonable in light of the circumstances confronting him before and during the encounter with Plaintiff.

213.    Defendant Harroun subjected or caused Plaintiff to be subjected to the deprivation of individual rights secured by the bill of right of the Colorado Constitution.

214.    Defendant Harroun did not act upon a good faith and reasonable belief that his actions in using unreasonable and excessive force against Plaintiff was lawful.

215.    The actions and inactions of Defendant Harroun's employer, Aurora, through the APD and Civil Service Commission, were moving forces behind and causal factors of the underlying constitutional violations to the Plaintiff.

216.    Given that the actions and inactions of Aurora, as described throughout this Amended Complaint, were causal factors of the underlying constitutional violations, pursuant to C.R.S. § 13-21-131(4)(a), Aurora must indemnify Defendant Harroun, even if he is ultimately convicted of a criminal violation for his conduct.[6]

217.    Also pursuant to C.R.S. § 13-21-131(4)(a), even if Aurora determines that Defendant Harroun did not act upon a good faith and reasonable belief that his actions were lawful, then Defendant Harroun merely "shall not be indemnified [by Aurora] for five percent of the judgment or settlement or twenty-five thousand dollars, whichever is less."

_____

[6] "A public entity does not have to indemnify a peace officer if the peace officer was convicted of a criminal violation for the conduct from which the claim arises unless the peace officer's employer was a causal factor in the violation, through its action or inaction." C.R.S. § 13-21-131(4)(a).

218.    In other words, even if Aurora's actions and inactions are not found to be causal factors in the underlying violations, Aurora can only escape indemnification in the amount of five percent of the judgment or settlement or twenty-five thousand dollars, whichever is less. Even so, under this scenario, "if [Defendant Harroun's] portion of the judgment is uncollectible, [Aurora] shall satisfy the full amount of the judgment or settlement." C.R.S. § 13-21-131(4)(a).[7]

219.    By failing to sufficiently train and discipline APD officers regarding de-escalation and the proper use of force, appropriate conduct for off-duty officers, and interacting with people of color and individuals with disabilities, among other things, Aurora caused the Plaintiff to be subjected to a deprivation of her civil rights.

220.    Aurora's well-documented history of using excessive force without fear of discipline, failure to train its officers in proper arrest control techniques, failure to require ongoing training for officers, failure to have minimum fitness standards, and condoning years of police brutality were the cause and moving force of the Plaintiff's civil rights deprivations.

221.    Aurora failed to create and oversee appropriate expectations for responsible behavior, and these failures were the moving force behind Defendant Harroun's unlawful use of force against the Plaintiff.

222.    Aurora, through the Civil Service Commission, also failed to investigate and hire officers in a manner that would not lead to unlawful uses of force by APD officers, as evidenced by findings in the AG's Report that the Civil Service Commission hires officers who show a predisposition for violence and escalation.

---

[7] "[A] plaintiff may be the beneficiary of indemnification by the municipality if the peace officer does not have the funds to pay the judgment." *Ditirro v. Sando*, 520 P.3d 1203, 1209 (Colo. App. 2022).

223.    Despite that Defendant Harroun performed poorly on the written exam and job suitability assessment for new recruits in 2020, instead of recognizing he was unfit to be a police officer, Aurora, through the Civil Service Commission, unilaterally set cut-off scores and acceptable minimum scores so that he could join the APD.

224.    In this case, based on information gleaned from prosecutors in the criminal process associated with this incident and the Independent Consent Decree Monitor's Report, Aurora was actually aware of "red flags" prior to hiring the Defendant which obviated the fact that he was an exceptional risk in terms of using unnecessary and excessive force against civilians, and specifically people of color. Nevertheless, Aurora saw fit to hire the Defendant, apparently content with the risk he posed to the community.

225.    Aurora is liable for the acts and omissions of its agents and/or employees, and for the herein described acts by Defendant Harroun, who was acting within the scope and course of his employment.

226.    Defendant Harroun's conduct described herein was attended by circumstances of malice, or willful and wanton conduct, which Defendant Harroun must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others, particularly Plaintiff.

**FIFTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 25 – Denial of Equal Protection**
(Against Defendant Harroun)

227.    Plaintiff hereby incorporates all other paragraphs of this Amended Civil Rights Complaint and Jury Demand as if set forth herein.

228.     Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

229.     Defendant Harroun, at all relevant times hereto, was acting under color of state law in his capacity as an Aurora law enforcement officer.

230.     Plaintiff has a protected interest under Colorado Constitution Article II, Section 25 to enjoy equal protection of the laws, including the right to be free from racial discrimination in actions by law enforcement officers.

231.     Defendant Harroun acted with the purpose of depriving Plaintiff of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of Colorado Constitution, Article II, § 25.

232.     Plaintiff identifies as Hispanic and/or Latina and is identifiable by her appearance as Hispanic and/or Latina.

233.     Plaintiff's race was a motivating factor in Defendant Harroun's decision to unlawfully use excessive force, as well as in his decision regarding how much force to use.

234.     Defendant Harroun treated Plaintiff less favorably than similarly situated white counterparts, wholly or in part because Plaintiff is Latina.

235.     Defendant Harroun acted with an intent or purpose to discriminate against Plaintiff because of her race.

236.     There was no rational basis for Defendant Harroun's discriminatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

237.     Defendant Harroun subjected or caused Plaintiff to be subjected to the deprivation of individual rights secured by the bill of rights of the Colorado Constitution.

238.   Defendant Harroun did not act upon a good faith and reasonable belief that his actions against Plaintiff based on racial bias were lawful.

239.   The acts and omissions of Defendant Harroun were the moving force behind, and proximate cause of injuries sustained by Plaintiff.

240.   The actions and inactions of Aurora, through the APD and Civil Service Commission, were causal factors of the underlying constitutional violations to the Plaintiff.

241.   Given that the actions and inactions of Aurora were causal factors of the underlying constitutional violations, pursuant to C.R.S. § 13-21-131(4)(a), Aurora must indemnify Defendant Harroun, even if he is ultimately convicted of a criminal violation for his conduct.

242.   Also pursuant to C.R.S. § 13-21-131(4)(a), even if Aurora determines that Defendant Harroun did not act upon a good faith and reasonable belief that his action was lawful, then Defendant Harroun "shall not be indemnified [by Aurora] for five percent of the judgment or settlement or twenty-five thousand dollars, whichever is less."

243.   In other words, even if Aurora's actions and inactions are not found to be causal factors in the underlying violations, Aurora can only escape indemnification in the amount of five percent of the judgment or settlement or twenty-five thousand dollars, whichever is less. Even so, under this scenario, "if [Defendant Harroun's] portion of the judgment is uncollectible, [Aurora] shall satisfy the full amount of the judgment or settlement." C.R.S. § 13-21-131(4)(a).

244.   Regarding causal factors, Aurora failed to reasonably train and supervise APD officers in specific issues relating to racial bias and racially biased policing, despite the obvious need to do so.

245.    Aurora knew or should have known that its failure to adequately supervise and train APD officers in such issues related to racial bias was likely to harm individuals like the Plaintiff; it was reasonably foreseeable that its failures in this area would cause the harm or a similar harm that Plaintiff suffered, is suffering, and will continue to suffer.

246.    Aurora, through the Civil Service Commission, also failed to hire and discipline officers in a manner that would not lead to racially biased policing, as evidenced by findings in the AG's Report that APD officers do not reflect the diversity of Aurora and that the Commission overturns disciplinary and termination decisions in high-profile cases in a manner that leads to officers who violate law and policy remaining on the force.

247.    With regard to Defendant Harroun, Aurora, through the Civil Service Commission, hired him as an officer in 2020 despite learning during the hiring process that he possessed a strong likelihood of policing in a discriminatory and racially biased manner, as evidenced by his examination and assessment results.

248.    The aforementioned failures of Aurora, through the Civil Service Commission, are causal factors that lead to APD officers using force against non-white groups 2.5 times more often than they use force against white people, including Defendant Harroun's use of force against the Plaintiff.

249.    Thus, it is no surprise that as a result of Aurora's actions and inactions, Defendant Harroun used excessive force and discriminated against the Plaintiff, a woman of color.

250.    In failing to reasonably investigate and hire, train, supervise, and discipline APD officers, including Defendant Harroun, in such issues relating to racial bias, Aurora caused

Plaintiff to be subjected to the deprivation of her rights to equal protection of the laws, as guaranteed by the Colorado Constitution, article II, § 25.

251.    Aurora's actions and omissions violated Plaintiff's state constitutional rights and were a substantial and significant contributing cause and proximate cause of Plaintiff's damages.

252.    Aurora did not act upon a good faith and reasonable belief that its actions and omissions in failing to adequately train and supervise APD officers in this area were lawful.

253.    Aurora is liable for the acts and omissions of its agents and/or employees, and for the herein described acts by Defendant Harroun, who was acting within the scope and course of his employment.

254.    Defendants' conduct described herein was attended by circumstances of malice, or willful and wanton conduct, which the Defendants must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others, particularly Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor, and against the Defendants, and award all relief as allowed by law and equity as appropriate, including, without limitation, the following:

      a.   Declaratory and injunctive relief;

      b.   Actual economic damages as established at trial;

      c.   Compensatory damages, including, without limitation, those for past and future pecuniary and non-pecuniary losses, pain and suffering, emotional distress, impairment of quality of life, reasonable and necessary medical and other expenses;

d.  Pre- and post-judgment interest at the highest lawful rate;

e.  Attorneys' fees and costs associated with this action; and

f.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 21st day of July, 2023.

HIGHLANDS LAW FIRM

_/s/ Zachary D. Warren_
Zachary D. Warren
Annika K. Adams
501 South Cherry Street
11th Floor
Denver, Colorado 80246
(720) 722-3880 (p)
(720) 815-3380 (f)
zwarren@highlandslawfirm.com

_Counsel for Plaintiff_