IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-01241-CNS-SBP

WYOMA MARTINEZ,

      Plaintiff,

v.

DOUGLAS HARROUN, individually, and
CITY OF AURORA, COLORADO, a municipality,

      Defendants.

---

## ORDER

---

This matter comes before the Court on Defendant City of Aurora's Motion to Dismiss Plaintiff's Second Amended Complaint. ECF No. 55. For the following reasons, the motion is DENIED.

## I.  BACKGROUND[1]

### A.  Factual Background

On January 11, 2023, Plaintiff Wyoma Martinez was walking her dog in her apartment complex when she was attacked by Douglas Harroun, then an Aurora Police Department officer who had recently been placed on administrative leave. ECF No. 54, ¶ 1. Ms. Martinez is a disabled women who has Complex Regional Pain Syndrome (CRPS),

---

[1] The following facts are drawn from Ms. Martinez's Second Amended Complaint, ECF No. 54. For purposes of this motion, the Court accepts as true, and views in the light most favorable to Ms. Martinez, all factual allegations contained in the complaint. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

a chronic condition that causes distressing pain. *Id.*, ¶¶ 11–12. Her CRPS also caused her to walk more slowly and with an impaired gait. *Id.*, ¶¶ 23–24.

On the evening of January 11, 2023, Plaintiff was walking her dog around her apartment complex. *Id.*, ¶ 22. Defendant Harroun, a resident of the same apartment complex, pulled into the parking lot at that time. *Id.*, ¶ 25. He aggressively approached Ms. Martinez with his vehicle, revving his engine and coming within a few feet of her. *Id.*, ¶ 26. When Ms. Martinez reached a stable position on the pavement, she turned and said, "what are you doing?" *Id.*, ¶ 27. Defendant Harroun then accelerated towards Ms. Martinez and slammed on his brakes right in front of her, essentially trapping her. *Id.*, ¶ 28. Defendant Harroun exited his vehicle. *Id*. Ms. Martinez told him that she had a disability called CRPS, told him to get away from her, and told him that she was prepared to call law enforcement. *Id.*, ¶ 29. Defendant Harroun then identified himself as a law enforcement officer and encouraged Ms. Martinez to call law enforcement, saying "Go ahead, I'm a cop." *Id.*, ¶ 30. Defendant Harroun's wife, while calling 9-1-1 for assistance, confirmed that he had identified himself as a law enforcement officer at the beginning of this interaction. *Id.*, ¶ 31. Ms. Martinez then asked Defendant Harroun, "So you're a cop? And he responded, "yes, I'm a police officer." *Id.*, ¶ 32. Ms. Martinez asked for his badge number, which he provided. *Id.*, ¶ 33.

Defendant Harroun continued being belligerent toward her, screaming inches away from her face, so close that she could feel spit hitting her face. *Id.*, ¶ 34. Defendant Harroun stated that Ms. Martinez should get out of the way and move more quickly while walking on the icy pavement. *Id.*, ¶ 35. Ms. Martinez told him, "You need to get away from

me." *Id.*, ¶ 36. Defendant Harroun's wife also exited the vehicle to confront Ms. Martinez, effectively cornering her against a garage door. *Id.*, ¶ 37. At one point during the exchange, Defendant Harroun's wife advanced toward Ms. Martinez. *Id.*, ¶ 39. To create more distance between them, Ms. Martinez defensively extended her hand towards Defendant Harroun's wife's chest. *Id.* She repeated that she had a disability and was not capable of moving any faster. *Id.*, ¶ 40.

Defendant Harroun's wife returned to the vehicle. *Id.*, ¶ 41. Ms. Martinez put her hand in her pocket, intending to call the police department on her cell phone, and realized that she did not have her cell phone with her. *Id.*, ¶ 44. She realized that she was carrying an unopened can of pepper spray. *Id.* Ms. Martinez warned Defendant Harroun that she had pepper spray on her, but she did not remove the protective packaging or attempt to use it. *Id.*, ¶ 45. Then, Defendant Harroun, without warning and allegedly "acting under the APD's Off-Duty Directive authorizing him to use force to effectuate an arrest," grabbed Ms. Martinez's wrist, punched her in the face with a closed fist, slammed her to the ground, and continued punching her four or five times in the face and throat while pinning her to the ground. *Id.*, ¶ 46. His goal, Ms. Martinez alleges, was to "disarm and detain" her, as he described to officers minutes later. *Id.*

Defendant Harroun again identified himself as a police officer, produced his badge, and told her that she was under arrest for "assaulting a peace officer." *Id.*, ¶ 37. He told Ms. Martinez that she was going to jail, pinning her to the ground with one hand around her neck, while she lay helpless and crying out in pain. *Id.*, ¶ 47.

Several witnesses, also residents of the apartment complex, heard Defendant Harroun identify himself as a law enforcement officer. *Id.*, ¶ 48. One witness asked for his badge identification number, which he provided. *Id.*, ¶ 50. That witness was on the phone with 9-1-1 responders and relayed the badge number to dispatchers. Defendant Harroun explained to witnesses and to Ms. Martinez that he was "just trying to disarm her and detain her." *Id.*, ¶ 52. Defendant Harroun stood back from her only after these witnesses intervened. *Id.*, ¶ 53.

Defendant Harroun then instructed Ms. Martinez to stand near one of the yellow parking pillars in the apartment parking lot. *Id.*, ¶ 56. He told her that she was under arrest, that she was not free to leave, and that he would physically subdue her again unless she stood in that specific spot until other officers arrived. *Id.* Ms. Martinez did as instructed, allegedly because she felt compelled to follow the orders of a law enforcement officer. *Id.*, ¶ 57. She told witnesses that Defendant Harroun had punched her multiple times, which he denied. *Id.*, ¶¶ 57, 66.

Coincidentally, the President of the Aurora Police Association, Paul Cancino, called Defendant Harroun at that moment to "check on his welfare since being involved in two critical incidents in the past two weeks." *Id.*, ¶ 59. Defendant Harroun told him, "I'm arresting a lady who tried to pepper spray me. I took the pepper spray away and have called 911." *Id.* Mr. Cancino, along with other APD officers, then arrived on the scene. *Id. Id.*, ¶¶ 59–60. The APD called the Arapahoe County Sheriff's Office to take over the investigation, upon learning that Defendant Harroun was an APD officer. *Id.*, ¶ 63. The Arapahoe County officers quickly determined that Defendant Harroun had instigated the

interaction, escalated it, and applied excessive force while placing Ms. Martinez under arrest. *Id.*, ¶ 64.

Ms. Martinez alleges that Defendant Harroun treated her pursuant to the "arrest control tactics learned from the PD." *Id.*, ¶ 68. She alleges that he told responding officers that he "did a progressive pivot, took her to the ground and disarmed her from the mace," as he was trained to do by the APD, because he felt a fear for his "vision and safety." *Id.* Ms. Martinez alleges that he was acting pursuant to the APD's Off-Duty Directive, which authorizes officers to use discretion to "take official police action" to "protect life" and "prevent bodily injury," and so he was responding as an Aurora Police officer. *Id.*, ¶ 72. He told officers after the incident, "I was just trying to do my job." *Id.*, ¶ 73.

As a result of the incident, Ms. Martinez suffered from a traumatic brain injury, impaired vision, vision loss, anterior abdominal wall trauma, severe exacerbation of her CRPS, new manifestations of her CRPS, and significant mental and emotional damages. *Id.*, ¶ 93.

Defendant Harroun's use of force was investigated by the Arapahoe County Sheriff's Office, allegedly "per policy given that he was actively working as an officer with the APD at the time of the incident." *Id.*, ¶ 101. On January 11, 2023, Defendant Harroun was arrested for his unjustified use of force and was charged with Assault 1 – strangulation (F3), Attempt to Influence Public Servant (F4), and Assault 3 (M1). *Id.*, ¶ 102.

About two weeks before the incident, on December 31, 2022, Defendant Harroun was placed on administrative leave following his role in a shooting, during which he shot

and injured another person. *Id.*, ¶ 105–06. He faces criminal charges for that incident as well. *Id.* Ms. Martinez alleges that he lied about the circumstances surrounding his decision to draw his service weapon and fire it. *Id.*, ¶ 108. Ms. Martinez alleges that, after he was placed on leave, he retained his badge and "all the attending powers and authorities that come with it, including the authority and ability to detain civilians, effectuate an arrest, and use force while off-duty." *Id.*, ¶ 109.

### B. Procedural Background

Plaintiff filed her complaint on April 18, 2023, ECF No. 1, and her first amended complaint on July 21, 2023, ECF No. 8. On September 22, 2023, the City of Aurora (the City) filed a motion to dismiss the first amended complaint. ECF No. 17. The Court held a hearing for oral argument on February 9, 2024 and granted the motion to dismiss. ECF No. 52.[2] In the interests of justice, the Court allowed Plaintiff to amend her complaint. *Id.* Plaintiff filed a second amended complaint on February 16, 2024. ECF No. 54. Plaintiff characterizes the changes in the second amended complaint as detailing "(1) the myriad objective indicia of authority exhibited by Defendant Harroun, (2) the Plaintiff's perception of Defendant Harroun's authority—prior to, during, and after—he went 'hands on' with the Plaintiff, and (3) compelling evidence, including recorded and contemporaneous statements by Defendant Harroun and others, indicating that he genuinely believed he was acting under color of law and according to his responsibilities as a POST-certified peace officer and an employee of the Aurora Police Department during his interactions

---

[2] In this hearing, the Court also denied as moot the City's objection to the order denying a stay of discovery, and entered a stay of discovery. ECF No. 52. This stay is now lifted.

with the Plaintiff." ECF No. 57 at 2. The City moved to dismiss the second amended complaint on February 29, 2024. ECF No. 55.

## II.  STANDARD OF REVIEW

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must allege facts, accepted as true and interpreted in the light most favorable to the plaintiff, to state a claim to relief that is plausible on its face. *See, e.g.*, *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). A plausible claim is one that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then a plaintiff has failed to "nudge [the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quotation omitted). In assessing a claim's plausibility, "legal conclusions" contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation omitted).

### III.  DISCUSSION

The Court has carefully considered Ms. Martinez's amended complaint, the parties' thorough briefing, and the relevant legal authority. For the following reasons, the Court denies the City's motion to dismiss.

### A.  Color of Law

A municipality faces § 1983 liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), where (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional violation. *Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009). The employee must have been acting "under color of state law." 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988).

In a § 1983 claim, the only proper defendants are "those who represent the state in some capacity, whether they act in accordance with their authority or misuse it." *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) (internal citations omitted). "Private conduct that is not fairly attributable to the State is simply not actionable under § 1983, however wrongful or discriminatory the conduct is." *Id.* (internal citations omitted). Acting under color of state law requires that the defendant exercise power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Jojola*, 55 F.3d at 492–93 (citing *West,* 487 U.S. at 49). The authority with which the defendant is "clothed" may be actual or apparent. *Id.* at 492 (citing *Griffin v. Maryland*, 378 U.S. 130, 135 (1964)). In the context of public employment, "state employment is generally sufficient to render the defendant a state actor," *Lugar v. Edmondson Oil Co.*,

457 U.S. 922, 935–36 n. 18 (1982), but it is also "well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." *Jojola*, 55 F.3d at 493.

Before conduct may be fairly attributed to the state, there must be a "real nexus" between "the employer's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." *Id.* It is the plaintiff's burden to plead that nexus. *Id.* "[A]cts of officers in the ambit of their personal pursuits are plainly excluded," and objective indicia of state authority, without more, do not "bring an officer's otherwise 'purely personal pursuits' within the scope of § 1983." *Screws v. United States*, 325 U.S. 91, 111 (1945). "For off-duty police officers, courts have considered factors such as (1) actual authority, (2) objective indicia of authority, (3) the victim's perception of the encounter, and (4) the defendant's belief as to whether he was acting under color of law. *Dry v. City of Durant*, 242 F.3d 388, at *4 (10th Cir. 2000) (unpublished). The critical inquiry for these cases is whether the individual possesses state authority and purports to act under it; in other words, the question is whether Defendant Harroun "proposed to act in an official capacity or to exercise official responsibilities pursuant to state law, or whether [his] actions related in some way to the performance of a police duty." *Rossiter v. Robinson*, 716 F. Supp. 2d 1018, 1024–25 (D. Colo. 2010) (citing *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1352–53 (10th Cir. 1996)). Whether a defendant acted under color of state law is a mixed question of fact and law. *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016).

The City argues that the *Dry* analysis is inapplicable where the officer did not have authority to act or was engaged in a purely personal pursuit. However, the Court finds that the *Dry* analysis is appropriate because it simply articulates the central inquiry of whether Defendant Harroun proposed to act under an official capacity or whether his actions related to the performance of a police duty. Whether Defendant Harroun had authority to act and was engaged in a purely personal pursuit go to the first two factors of the *Dry* analysis.

The first factor of the *Dry* analysis, actual authority, favors the City. The City argues that Defendant Harroun was not acting under color of law when he attacked Ms. Martinez because he was an administratively suspended officer, not merely an off-duty officer, and so he did not have any actual authority to act. ECF No. 55 at 3. The Court agrees. He was explicitly advised, in the administrative leave memorandum that he signed, "You will not take any action as a sworn police officer." ECF No. 17-1. However, as Plaintiff argues, it is also true that acting with apparent authority can be sufficient; this goes to the second factor of the analysis.

The City points to *Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990) in support of its assertion that officers on leave are different than off-duty officers. In *Gibson*, the officer had been placed on medical leave and was directed not to carry his gun or "exercise the power of arrest or any other police power." *Id.* at 1512. Soon afterward, he encountered Mr. Gibson, identified himself as a police officer, drew his gun, told Mr. Gibson that he was under arrest, and fatally shot him in the chest. *Id.* at 1513. The Seventh Circuit found that the officer was not acting under color of law because he had

been divested of all power and authority to act as a police officer, so his action could not have been related in some way to the performance of a police duty. *Id.* at 1517.

The Court finds that *Gibson* is persuasive as to the first factor. As in *Gibson*, Defendant Harroun was placed on leave and was expressly stripped of all power and authority to act as a police officer when he was instructed to "not take any action as a sworn police officer." ECF No. 17-1. Plaintiff argues that the Court should not follow *Gibson* because the Tenth Circuit does not differentiate between off-duty and on-leave officers. However, that appears to be because the cases the Tenth Circuit has seen involve off-duty officers. *See, e.g., David*, 101 F.3d at 1353 (gathering cases). The other cases that Plaintiff cites similarly involve off-duty officers. The Court finds that an officer on administrative leave does not have the same authority that an off-duty officer has, especially when given the specific directive to not act as a police officer. However, this lack of actual authority only goes to the first factor. In the Tenth Circuit, the inquiry is not simply whether the action related in some way to a police duty; it also includes whether the officer proposed to act in an official capacity. The actual authority possessed by the officer does not relate to the second prong, and so the conclusion that Defendant Harroun possessed no actual authority is not the end of the analysis.

The second factor, objective indicia of authority, favors Plaintiff. Plaintiff points to numerous objective indicia of authority: Defendant Harroun identified himself as a police officer at the beginning of their interaction; he provided his badge number prior to using force against her and produced his badge as he attempted to arrest her; he acted to "disarm and detain" Plaintiff under the APD's Off-Duty Directive; and he used APD-trained

arrest control techniques. ECF No. 54, ¶¶ 30, 33, 46, 47, 52, 59, 61, 62, 68. Plaintiff argues that these actions are "the most quintessential of police activities" and so clearly are related to a police duty. ECF No. 57 at 6.

The City argues that Defendant Harroun was engaged in a purely personal pursuit, and did not demonstrate sufficient objective indicia of authority. In *Haines v. Fisher*, 82 F.3d 1503, 1508 (10th Cir. 1996), the Tenth Circuit held that on-duty officers were not acting under color of law when they staged a robbery of a convenience store as a practical joke, because they did not use their state authority to commit the offense. Similarly, other courts have found that officers engaging in violence related to private disputes were not acting under color of law. *See, e.g., Delcambre v. Delcambre*, 635 F.2d 407, 408 (5th Cir. 1981) (police chief who assaulted someone at police headquarters was not acting under color of law because it was about a family dispute); *Parilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445 (1st Cir. 1997) (officer was not acting under color of law when he shot someone because of a barroom dispute); *Barna v. City of Perth Amboy*, 42 F.3d 809 (3d Cir. 1994) (officer who assaulted family member with service revolver and nightstick was not acting under color of law); *Hill v. Barbour*, 787 F. Supp. 146 (N.D. Ill. 1992) (off-duty sheriff's deputy who chased a suspect from his property and shot him with his personal rifle was not acting under color of law, despite yelling "sheriff"); *Pitchell v. Callan*, 13 F.3d 545 (2d Cir. 1994) (off-duty officer who shot a guest in his home with a personal weapon was found not to have acted under color of law, even though he had recently changed out of his uniform).

The above cases are notably distinct from *Griffin*, in which the Supreme Court held that a security guard who was deputized as a sheriff was acting under color of law because he identified himself as a deputy sheriff, made arrests, transported arrestees to the police station, and filled out a form titled "Application for Warrant by Police Officer." *Griffin*, 378 U.S. at 133–35. The Court in *Griffin* held that, "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action." *Id.* at 135. Similarly, off-duty officers whose actions were related to their police duties were found to be acting under color of law. *See Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122 (1st Cir. 1999) (two uniformed off-duty officers who intervened in a fight were found to be acting under color of law because the action was consistent with their responsibilities as police officers).

Here, the incident does not appear to be a purely personal pursuit. Some aspects of the incident indicate that Defendant Harroun had personal motivations for his actions: for instance, he told Ms. Martinez that she should get out of the way and move more quickly, indicating that he was irritated at her for walking slowly. ECF No. 54, ¶ 35. He also was not wearing a uniform, was not in a police vehicle, was at his personal residence, instigated the interaction, and behaved aggressively toward her before identifying himself as an officer. However, Plaintiff has pleaded more objective indicia that he was acting under color of law: he identified himself as a police officer, produced his badge, told Ms. Martinez that she was under arrest for assaulting a police officer, and told her that she was going to jail. ECF No. 54, ¶¶ 47, 50, 52, 59–62. These indicia, particularly the fact

that he attempted to arrest her, are sufficient objective indicia of state authority, despite his arguably personal motivation for acting.

As to the third factor, Plaintiff's subjective belief, Plaintiff plausibly alleges that she believed that she was interacting with a police officer. Plaintiff alleges that Defendant Harroun identified himself as an officer at the beginning of their interaction and that she had complied with his instructions because he identified himself as a police officer, produced his badge, and provided his badge number. ECF No. 54, ¶¶ 56–58. While Defendant Harroun acted aggressively toward her before identifying himself as an officer, the Court accepts as true Plaintiff's allegations that he immediately identified himself as a "cop" upon exiting his car and that Ms. Martinez believed him. ECF No. 54, ¶¶ 28–32.

Finally, Plaintiff plausibly pleads that Defendant Harroun subjectively believed that he was acting under color of law. Plaintiff alleges that he believed that he was acting under color of law, pursuant to the APD's Off-Duty Directive "authorizing him to use force to effectuate an arrest," because he identified himself as an officer, relayed his badge number, and flashed his badge. Minutes after the incident, he told the president of the Aurora Police Association that "I'm arresting a lady who tried to pepper spray me." *Id.*, ¶ 59. He also told Ms. Martinez that she was under arrest, that she was not free to leave, and that he would physically subdue her unless she stood in a particular spot. *Id.*, ¶ 56. He then stated, to officers and bystanders, that he was "just trying to do my job" and that he was trying to "disarm and detain" Ms. Martinez. *Id.* ¶¶ 46, 52. Finally, Defendant Harroun admitted that he was acting under color of law in his answer. ECF 56, ¶¶ 4, 57,

60, 72. While that admission is not dispositive, it is compelling evidence, when combined with his behavior, that he legitimately believed he was acting under state authority.

The City makes a compelling argument that Defendant Harroun could not have truthfully believed that he was acting under color of law because he had signed the administrative leave memorandum that explicitly stated, "You will not take any action as a sworn police officer, nor are you allowed to work any secondary employment or wear your police uniform." ECF No. 55 at 8; ECF No. 17-1. However, acknowledging a document does not necessarily equate to subjectively understanding when it applies. Plaintiff alleges that the Off-Duty Directive is not clear, so it is possible that Defendant Harroun legitimately believed both that he was not to act as a sworn police officer and that he retained some authority to act pursuant to the Off-Duty Directive. Regardless, the allegations that he identified himself as an officer to Plaintiff, bystanders, and investigating officers plausibly indicates that he believed he was acting as an officer.

In sum, the primary inquiry is whether Defendant Harroun "proposed to act in an official capacity or to exercise official responsibilities pursuant to state law, or whether [his] actions related in some way to the performance of a police duty." *Rossiter*, 716 F. Supp. 2d at 1024–25. Using the four factors from *Dry*, the Court finds that Plaintiff has sufficiently alleged that Defendant Harroun was acting under color of law to survive the motion to dismiss. While he had no actual authority to act as a police officer, he displayed sufficient objective indicia of such authority, and, as alleged, both he and Ms. Martinez plausibly subjectively believed that he was acting on that authority.

**B. Municipal Policy**

To show that an entity is liable for the employee's violation of a plaintiff's constitutional rights, the plaintiff must establish (1) the existence of a policy or custom; (2) a "direct causal link between the policy or custom and the injury alleged," meaning that the policy or custom was the "moving force" behind the violation of the plaintiff's constitutional rights; and (3) that the entity enacted or maintained the policy with "deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *Hollingsworth v. Hill*, 110 F.3d 733, 744 (10th Cir. 1997).

A plaintiff satisfies the "official policy or custom" element by plausibly alleging the existence of:

> (1) a formal regulation or policy statement;
> (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law;
> (3) the decisions of employees with final policymaking authority;
> (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or
> (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations and formatting omitted). The "official policy or custom" requirement is intended to distinguish "acts of the municipality from acts of employees of the municipality," making clear that municipal

liability is limited to actions "for which the municipality is actually responsible." *Cacioppo v. Town of Vail, Colo*., 528 F. App'x 929, 932 (10th Cir. 2013). To plead the existence of an informal custom, plaintiffs can either plead "a pattern of multiple similar instances of misconduct," with no set number required, or use other evidence to attest to the policy's existence. *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015).

The "deliberate indifference" element may be satisfied where the entity has actual or constructive knowledge that its action or failure to act is "substantially certain to result in a constitutional violation," and the entity "consciously or deliberately" chooses to disregard the risk of harm. *Schneider*, 717 F.3d at 771 (quotation omitted). Notice can be established either by a "pattern of tortious conduct" or if a violation of rights is a "highly predictable" or "plainly obvious" consequence of the entity's action or inaction. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

Plaintiff alleges the existence of many municipal policies under the third claim, "failure to hire, investigate, train, supervise, and discipline *Monell* claim." ECF No. 54, ¶¶ 229–45. It is somewhat unclear how Plaintiff defines these policies. In the Second Amended Complaint, Plaintiff alleges that the following policies caused the constitutional violations: the Off-Duty Directive does not strip its officers of authority to make arrests and detain civilians; the Administrative Leave policy allowed its officers to retain their badges and did not provide clear instruction on what an officer on leave should do if a situation covered by its Off-Duty Directive arose; Aurora failed to properly train, supervise, and discipline its employees with respect to the use of force and responsibilities relative to off-duty interventions and interactions with people of color and individuals with

disabilities; Aurora failed to properly train, supervise, and discipline its employees by inculcating a responsibility on the part of the officers (through formal policy, training, and actual practices and habits within the department) to actively seek out potentially dangerous and violent interactions while off-duty by implementing and endorsing a "never off-duty" approach to interacting with individuals in the community, the consequences of which result in increased incidents of unwarranted and unnecessary force against people of color and individuals with disabilities; Aurora, through the Civil Service Commission, failed to hire officers in a manner that would not lead to the deprivation of the Plaintiff's constitutional rights; Aurora, through the Civil Service Commission, also failed to discipline officers in a manner that would not lead to unlawful uses of force because it overturns disciplinary decisions recommended by the Chief of Police in such a way that officers who violate the law remain on the force, thereby ratifying APD officers' uses of excessive force; and Aurora reinstates officers who resign from the APD in lieu of termination due to using excessive force in the course of their employment. *Id.*

Additionally, in her response, Plaintiff appears to define three policies: "(1) the City, through the Civil Service Commission, made the 'controversial' decision to hire Defendant Harroun despite knowing of his propensity for violence and general lack of fitness to serve as an officer [SAC ¶¶ 104-121]; (2) the City's widespread failures in training, supervision, and discipline with respect to the use of force and interacting with minorities and people with disabilities influenced and instructed Defendant Harroun to use his discretion in a constitutionally inadequate manner [SAC ¶¶ 122-168]; and (3) the City, through the Civil Service Commission, failed to discipline its officers, including Defendant Harroun, thereby

ratifying officers' uses of force and signaling that such force is tolerated and encouraged [SAC ¶¶ 229-245]." ECF No. 57 at 13. Plaintiff then describes a fourth policy: that the City "failed to create and implement adequate policies, procedures, supervision, and training with respect to the APD's Off-Duty Directive and Administrative Leave Policy." ECF No. 57 at 13; ECF No. 54, ¶¶ 230–34.

For purposes of this analysis, the alleged policies will be grouped into five policies: (1) allowing officers on administrative leave to retain their badges and indicia of authority; (2) condoning the use of excessive force, particularly against people of color; (3) failing to have clear Off-Duty Directive and Administrative Leave policies; (4) knowingly hiring an unsuitable candidate; and (5) failing to train, supervise, and discipline its officers. *See* ECF No. 57 at 14. Since failure to train theories are analyzed under a different standard, these theories will be analyzed separately.

Plaintiff adequately pleads the existence of the first four policies. The first and third policies are official policies, so their existence is clear. Plaintiff alleges that Defendant Harroun exhibited red flags in his hiring process that indicated a propensity for violence, and he was hired anyway, so pleads the fourth policy's existence. ECF No. 54, ¶ 266. As to the second policy, Plaintiff alleges that the "never off-duty" approach leads to excessive force, that actions in hiring and discipline awards officers who use excessive force, and that Aurora has a "well-documented history of using excessive force without fear of discipline." *Id.*, ¶¶ 234, 239, 262. To illustrate that history, Plaintiff alleges reports, statistics, and prior incidents. APD officers use force against non-white groups 2.5 times more often than they use force against white people, *id.*, ¶¶ 134, 290; the Civil Service

Commission operates so that "Aurora Police officers who violate law or policy often remain on the force," *id.*, ¶ 138; and the Attorney General's Report concluded that "[m]ost failures with Aurora Police relate to systemic and severe culture problems," *id.*, ¶ 139.

Prior incidents also plausibly demonstrate the existence of this policy. On August 2, 2020, five APD officers forced Brittany Gilliam and four children out of their car at gunpoint. *Id.*, ¶ 149. On March 1, 2020, an officer pointed a gun at Dr. P.J. Parmar on his property, without reasonable suspicion that he had committed a crime. *Id.*, ¶ 150. On August 27, 2019, an APD officer arrested Shataeah Kelly and left her in a dangerous and uncomfortable position in the patrol car for over 20 minutes. *Id.*, ¶ 151. On August 24, 2019, officers tackled, assaulted, and killed Elijah McClain. *Id.*, ¶ 152. On June 30, 2020, officers reenacted elements of the use of force against Mr. McClain and took pictures. *Id.*, ¶ 153. On June 27, 2020, in response to a vigil honoring Mr. McClain, officers used force against peaceful protesters. *Id.*, ¶ 154. On November 21, 2018, an APD officer slammed Jamie Alberto Torres to the ground after he momentarily paused before complying with an illegal order to exit his garage. *Id.*, ¶ 155. On September 6, 2018, APD officers responded to a car accident and beat and tased Andre Williams, who was having a seizure and so was not responding to orders. *Id.*, ¶ 156. On July 13, 2017, officers choke-slammed and hog-tied Vanessa Peoples for not complying with all of their directives. *Id.*, ¶ 157. On April 22, 2017, APD officers used force on Brandon Washington after he was in a car accident. *Id.*, ¶ 158. On September 14, 2016, an officer smashed Dennis Seabaugh's head down and broke his arm while he was detained in jail, without giving him an opportunity to comply. *Id.*, ¶ 159. On June 29, 2015, APD officers used excessive

force against Jeffrey Gale, including kicking him in the head and back. *Id.*, ¶ 160. On March 6, 2015, an officer shot and killed Naeschylus Vinzant-Carter, who was unarmed. *Id.*, ¶ 161. On September 25, 2014, an officer used excessive force in arresting Cory Scherbarth. *Id.*, ¶ 162. On July 28, 2014, officers used aggressive take down tactics on Gaye O'Malley after she called 911 for medical assistance for a friend. *Id.*, ¶ 163. On July 3, 2014, officers used excessive force against Adam Bentz for recording APD towing his vehicle. *Id.*, ¶ 164. And on December 18, 2010, officers used force on Rickey Burrell after he had a seizure. *Id.*, ¶ 165. These incidents, Plaintiff alleges, add up to a "consistent pattern of unconstitutional police behavior." *Id.*, ¶ 166. Plaintiff sufficiently alleges the existence of these policies.

Plaintiff also adequately pleads causation regarding the first four policies. As alleged, these policies led Defendant Harroun to believe that he had the authority to effectuate an arrest using excessive force. The City argues that Plaintiff cannot establish causation, first because Chief Acevedo had placed Defendant Harroun on leave and told him what he could and could not do on leave. ECF No. 55 at 11. However, as established above, Plaintiff has plausibly alleged that Defendant Harroun believed that he was acting under color of law, so the causal chain is still intact. Plaintiff sufficiently alleges that these policies created that belief: "The City's failure to create, implement, and adequately train and supervise its officers with respect to its Off-Duty Directive was the moving force behind and a causal factor of Defendant Harroun's belief that he had authority to respond to this incident despite being on administrative leave." ECF No. 54, ¶ 124. Plaintiff also adequately alleges causation as to the policies involving excessive force: "Aurora's

21

longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying the use of excessive force, particularly against people of color and individuals with disabilities, caused Defendant Harroun to use unlawful excessive force against the Plaintiff." *Id.*, ¶ 122.

The City asserts that Harroun was engaged in a purely private act, and so no municipal policy could have caused his action. Because Plaintiff adequately pleads that Harroun was not engaged in a purely private act, as analyzed above, this argument here is rejected.

Plaintiff also adequately pleads deliberate indifference as to the policies regarding administrative leave:

> It was plainly foreseeable that the lack of clear policies and existence of conflicting policies on acting while off-duty and being placed on administrative leave would lead to this exact situation: an officer responding to this incident in the manner he believed the City wanted him to by virtue of the City having an off-duty policy that allowed him to retain his badge and make arrests while not in uniform or on the clock.

*Id.*, ¶ 125. In other words, it was plainly obvious that failing to implement clear policies and allowing officers on administrative leave to retain their badges would lead them to attempt an arrest in excess of their authority, such that the city was on notice. As to the policy of condoning the use of excessive force, Plaintiff sufficiently pleads that the City was on notice based on both the obviousness of the outcome and the alleged pattern of tortious conduct of Aurora officers using excessive force: against Brittany Gilliam and her four children, P.J. Parmar, Shataeah Kelly, Elijah McClain, protestors at the Aurora Municipal Center, Jamie Alberto Torres, Andre Williams, Vanessa Peoples, Brandon

Washington, Dennis Seabaugh, Jeffrey Gale, Naeschylus Vinzant-Carter, Cory Scherbarth, Gaye O'Malley, Adam Bentz, and Rickey Burrell. *Id.*, ¶¶ 149–65.

Plaintiff also adequately pleads deliberate indifference based on the theory that the Civil Service Commission hired Defendant Harroun despite his red flags. In the hiring context, deliberate indifference only exists where adequate scrutiny "would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 411. Plaintiff alleged that Defendant Harroun's propensity for violence was "plainly obvious" due to his poor testing results, and so excessive use of force was a plainly obvious consequence of hiring him. This allegation is sufficient to plead deliberate indifference as to this theory.

### 1. Failure to Train, Supervise, and Discipline

Entity liability is at its "most tenuous" when premised on a failure-to-train theory. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Under a failure to train theory, liability attaches when the "need for more or different training was so obvious, and the inadequacy so likely to result in [the constitutional violation] that the policymakers of [the county] can reasonably be said to have been deliberately indifferent to the need for additional training." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). Liability under a failure to train theory turns on whether the defendants had "[n]otice of particular deficiencies in a training program." *Est. of Lobato v. Correct Care Sols., LLC*, No. 15-CV-02718-PAB-STV, 2017 WL 1197295, at *7 (D. Colo. Mar. 31, 2017); *Zartner v. City and Cnty. of Denver*, 242 F. Supp. 3d 1168, 1173 (D. Colo. Mar. 13, 2017). The causation inquiry

"focuses on whether the injury could have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Est. of Lobato,* 2017 WL 1197295, at *7. Deliberate indifference exists when a municipality continues to adhere to a training program that "they know or should know has failed to prevent tortious conduct by employees." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997).

Here, Plaintiff alleges that the City's training program was inadequate in two ways: it did not properly train officers on the use of force and proper arrest control techniques, and it did not properly train them with respect to its Off-Duty Directive and Administrative Leave Policy. These are specific deficiencies in Aurora's policies and training, so Plaintiff adequately pleads the existence of deficiencies in the training protocol.

Plaintiff also adequately pleads causation and deliberate indifference. The failure to train on the leave policy caused Defendant Harroun to use his discretion, and the authority he believed he had, to attempt to arrest Plaintiff. *See* ECF No. 54, ¶ 233. Plaintiff established deliberate indifference by pleading the obviousness of the deficiency in the training protocol sufficient to put the City on notice: it is plainly obvious that failing to adequately train and supervise its officers regarding what authority they have while on administrative leave would result in an officer believing he had authority to effectuate arrests under the Off-Duty Directive. This training deficiency is similar to that in *Brown v. Gray*, 227 F.3d 1278 (10th Cir. 2000), which declined to overturn a jury verdict finding *Monell* liability based on Denver's policy of inadequately training officers who were

"always on duty," leading an off-duty officer to shoot someone in an attempted arrest. Plaintiff adequately pleads failure to train on the administrative leave policies.

To prevail on a theory of failure to train police officers in the use of force, Plaintiff must allege that the training was inadequate, and then allege that:

> (1) the officers exceeded constitutional limitations on the use of force;
> (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal;
> (3) the inadequate training demonstrates deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and
> (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000). Here, Plaintiff meets these requirements: she alleges that "Aurora knew that its training and policies were a causal factor and substantially certain to cause Aurora police officers to violate individuals' constitutional rights, like the Plaintiff, because the APD has been under significant scrutiny for some time, and numerous investigations have reached the same conclusions regarding Aurora's need for better training and supervision in the areas of use of force and avoiding racially biased policing." ECF No. 54, ¶ 171. Plaintiff also alleges that Defendant Harroun used excessive force on Ms. Martinez, *id.*, ¶ 250; that off-duty encounters are common, especially because the City encourages officers "to actively seek out potentially dangerous and violent interactions while off-duty," *id.*, ¶ 234; and that inadequately training Defendant Harroun in the use of force when off-duty caused him to use excessive force when on leave, which caused Ms. Martinez's injury, *id.*, ¶ 233.

Plaintiff also pleads deliberate indifference on the excessive force theory by pointing to prior events that establish a pattern of tortious conduct. The alleged pattern of tortious conduct involved the incidents of excessive force previously described. *Id.*, ¶¶ 149–65. This theory is adequately pleaded.

However, the City convincingly argues that the failure to discipline theory fails for lack of causation, because Defendant Harroun was not involved in prior incidents other than the shooting that prompted his administrative leave. The Court agrees that Defendant Harroun was disciplined—the City immediately initiated an investigation and placed him on leave—so the allegations of a failure to discipline applied to other officers, not Defendant Harroun. The argument that the widespread failure to discipline "send[s] a signal that Aurora not only tolerates, but actually endorses and awards officers who use excessive force" is too attenuated to properly attribute Defendant Harroun's actions to the City's failure to discipline other officers. Thus, the failure to train and supervise claim should only proceed on the inadequate training theory, not on the failure to discipline theory. However, this widespread failure to discipline can still be relevant as evidence of the widespread custom of condoning the use of excessive force.

\* \* \*

In sum, Plaintiff has adequately alleged *Monell* liability based on several theories of municipal liability, so the Court declines to dismiss the claims against the City.

## IV.  CONCLUSION

Because Defendant Harroun was plausibly acting under color of law pursuant to municipal policy, the City of Aurora's Motion to Dismiss Plaintiff's Second Amended Complaint, ECF No. 55, is DENIED.

DATED this 18th day of September 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge